**UNITED STATES of America, Plaintiff,**

**v.**

**James J. DOYLE a/k/a Humbert John Battisti, Wanda June Doyle, Hope Kwon a/k/a Hope Shirley Kwon a/k/a Ok Im Kwon, Kyong Sue Kwon, Kyong Kwon, Charles Wright, John Abels, Roy Allis, A. A. Almond, Ernest R. Anderson, Harland Asmus, William Barr, Esther Baum, George Beentken, Hanna Bents, Francis Berg, Eileen Bird, Kenneth Bents, Henry Blome, Harold Bosshart, Chris Boyd, Lydia Charlson, Tommy Chicos, Marian De Leon, Otis Egeness, Albert Engelby, Carlyle Engelby, Mary Lou Erdahl, Morris Erdahl, Sigred Estebo, Luella Bleichwell, Genevieve Fitzgerald, Fredrick Flynn, Fred Gattz, Hazel Geak, John Gerber, Edna Gerken, Alfred Goltz, Henry Goltz, Catharine Goshorn, Adena Grunzke, Lydia Haase, Roger Hageman, June Hagger, Tilmer Halvorson, Florence Heitland, Harold Hove, Charles Huber, Richard Ingebritson, George D. Johnson, Norma Johnson, Olive Nelson, Herbert Keller, Maynard Klenk, Frank R. Kalapton, Ellsworth Knewtson, Bertha Krieger, Elsie M. Krueger, Maria A. Krueger, Ruth L. Kuss, Virgil Lawrence, Darlene Legred, Elmer Leibrand, Amei Limberg, Robert C. Linder, Harold Loge, Thomas H. Lubitz, Gladys I. Ludwig, Everett Madetzke, James Mastin, Oliver Matson, Marshall Michaelson, Gladys McCormick, Wesley Meyer, Esther Nelson, Vivian H. Nelson, Eugene Nodland, Wayne Oelke, Orville Olson, Lyle Owen, Bernice Peters, Edward Pfaffinger, Otto Pfaffinger, Rueben Prestegard, Marie Queensland, Albert Renkley, Richard Renkley, Stan Rudolph, Gordon Saunders, Evelyn Shortenhaus, John A. Silrum, Hazel Stauffer, Marvin Steinhauer, Arvid Stenehjem, Steve Stevermer, Orletha Stewart, John C. Stewart, Fred Stowell, Camillis Temple, Milton Tenneson, Jerold Thoreson,**

Eugene Tyson, Orville Urbain, Dr. Robert Urbatsch, Cecilia Waldorf, Milton Weber, Oliver Wendt, George Weppler, Margaret Wettlaufer, Louis Wiese, Frances Wilkins, John Wilson, Roy Yeager, Charles Yenish, Robert Woolery, Charles Zehm, Albert Zierke, John Doe, Jane Doe, Richard Roe, J. Doe, Inc., Doe & Doe, a partnership, Donald Gilreath, Chester M. Short, and Lucille Short, Defendants.

LARKIN, HOFFMAN, DALY & LIND-
GREN, LTD., a Minnesota Professional Corporation, Plaintiffs,

v.

The UNITED STATES of America; Wanda June Doyle; James J. Doyle; Esther Baum; Joseph Pfaffinger; Kathleen Pfaffinger; Vrenelle Grunzke; Adena Grunzke; Audrey A. Looft; Gurney Farrow; Eldon Larson; Mrs. Eldon Larson; Tammy Jo Larson; Otis Egeness; Lester Egeness; Gladys Ludwig; Mrs. Arnold Egeness; Arlett Egeness Gold; Hazel Egeness O'Rourke; Irene Egeness Johnson; Rosella Flynn; Luella Bleichwehl; Anna Vargen; Anna May Nodlend; Maynard C. Klenk; Gordon L. Saunders; Mrs. Gordon L. Saunders; Cynthia Peterson; John Doe; Jane Doe; Richard Roe; J. Doe, Inc., a corporation; Doe and Doe, a partnership, Defendants.

Civ. Nos. 4–78–133, 3–78–22.

United States District Court,
D. Minnesota,
Fourth and Third Divisions.

March 11, 1980.

John H. Frundt of Frundt, Frundt & Johnson, Blue Earth, Minn., for "closet bond" claimants.

Deputy State Atty. Gen. Thomas R. Muck, St. Paul, Minn., for the Minnesota Commissioner of Securities, Mary Alice Brophy, the receiver.

Joseph R. Gadola, Wells, Minn., Nancy C. Dreher of Leonard, Street & Deinard, Minneapolis, Minn., and Charles A. Porter, Jr. of Frommelt & Eide, Minneapolis, Minn., for various "suitcase bond" claimants.

Asst. U. S. Atty. Stephen G. Palmer, Minneapolis, Minn., for interpleader plaintiff United States of America.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

RENNER, District Judge.

The above-entitled case came on for hearing before the undersigned on January 16, 1980, pursuant to paragraph 14 of the Order for Distribution of the Honorable Donald D. Alsop, United States District Judge, dated December 28, 1979, directing the undersigned, as Special Master, to conduct the hearing for the purpose of determining entitlement and priority of interest claims of the "closet bond" claimants.

Since the date of the hearing, the undersigned has been appointed a judge of United States District Court. As part of the general reassignment of cases, this consolidated interpleader has been reassigned to this Court and the special mastership has terminated.

Based upon the briefs and arguments of counsel and the entire record herein, the Court issues the following Findings of Fact, Conclusions of Law and Order, as well as the attached Memorandum.

## FINDINGS OF FACT

1. For many years prior to November 1977, James J. Doyle was a securities broker in Blue Earth, Minnesota. Many of his customers who purchased bearer bonds from him are claimants in these proceedings. For a time he was employed by the brokerage house of John G. Kinnard and Company; and, after termination of his employment by Kinnard and subsequent revocation of his license by the State of Minnesota, he continued to transact business independently and through surrogates.

2. Doyle's regular practice was to purchase bearer bonds in large lots, (sometimes as much as $100–300,000) in fictitious nominee names, before he received an order from the customer. He thus held an inventory from which he would then sell his customers, in effect, participation interests in the large denomination bearer bonds. This *modus operandi* resulted in his commingling customers' purchase money, sometimes using a customer's purchase money to buy bonds which were sold to others. He may also have commingled his own funds with those of his clients in making purchases. Since bonds were recovered in small denominations, it appears that Doyle also had a practice of having the bonds reissued in bearer form in smaller denominations to conform to the customers' purchases.

3. Doyle did not normally deliver physical possession of the bonds to his customers

who had made a purchase. Instead, he retained possession of them and held them in safekeeping. His normal practice was to place the bond a customer had purchased in an envelope and to mark the customer's name and address, but not bond number, on the front of the envelope. At first, he kept all the envelopes in safe deposit boxes rented from a local bank. He carried unsold bonds with him on his person or kept them in his possession, custody and control. At night, when he left his office he would take unsold bonds home and place them in his home safe overnight, returning them to the office the next day. Later, he abandoned the practice of using the bank safe deposit boxes and, instead, kept the envelopes in safes in his home and office to which he, of course, and perhaps his family and secretary had access, but his customers did not.

4. The claim forms and documentation submitted by Doyle's customers in this action reflect that after a customer had made a purchase, Doyle would normally send the customer a confirmation slip which listed issuer, denomination, interest rate and due date, but not bond number. From time to time, sometimes when new purchases or substitutions were made, he would send the customers letters, stating that he was holding a bond or bonds from them in safekeeping, identifying bonds by issuer, due date, interest rate and denomination, but not by number. As periodic interest came due on the bonds, he would slip the coupons, mail them into the issuers, and, after having received the interest payment from the issuer, distribute the interest to the customers, sometimes in cash, sometimes in check. The closet bond claimants' purchases were, for the most part, confirmed with the standard confirmation slips used by Doyle, but most of them have filed no proof that confirmation letters were sent, and few have furnished any written evidence that they received interest payments from him.

5. No records are available which would make it possible for Doyle's customers to trace their purchase money to ownership of a specific and particular bond recovered in these proceedings. Doyle's sales records were his envelope segregation system and a separate looseleaf binder which he maintained in his office or home in which he would record customers' purchases. Since Doyle destroyed these records when he fled the United States in November 1977, they are not available to the Court for its assistance in determining ownership of any of the bonds. The Court cannot determine, for example, whether the bonds were in any way specifically identified as belonging to a customer. What is clear is that Doyle made no attempt to match, and could not have matched, any customer to any particular bond number that he had in his possession. Further, Doyle has himself admitted that although he attempted to maintain records of ownership (either by segregating bonds in envelopes, keeping a record in the looseleaf binder, or confirming purchases to customers with confirmation slips or letters), he often was not able to do so accurately. Confirmation slips or letters, even when sent, were sometimes inaccurate, substitutions were sometimes made without notifying customers, and Doyle sometimes purchased issues other than those the client had specified for purchase.

6. Sometime in the fall of 1977, Doyle decided to flee the country. In preparation for that flight, he removed almost all of his customers' bearer bonds from the envelopes in which he had placed them and put them in a suitcase or suitcases which he took with him. He then threw away the envelopes and the looseleaf pages from the binder in which he had recorded purchases. The bonds, having a total face value of approximately $2 million, have been referred to throughout these proceedings as the "suitcase bonds". When Doyle was apprehended in the Panama Canal Zone in December 1977, the suitcases and their contents were recovered by government authorities, and the bonds were returned to this jurisdiction. Thereafter, the United States commenced an interpleader action (File No. 4–78 Civil 133) seeking to have the Court determine ownership of the suitcase bonds and named as defendants all known Doyle customers and all persons who might claim an interest in them.

7. After Doyle left the country, members of his family or staff found a number of envelopes in a closet in Doyle's office. The Court assumes that this was a closet to which family and his secretary, Dorothy Brotherton, had free and open access, but to which his customers did not. Doyle left no written or oral instructions along with the envelopes directing what should be done with them or the bonds contained therein. The envelopes contained approximately $300,000 in bearer bonds. The envelopes bore the name and address of certain of Doyle's customers (approximately 15 of the 100 or so who filed claims herein), but provided no further identification, and specifically, no bond numbers. These bonds have been referred to throughout these proceedings as the "closet bonds".

8. It appears that family members or staff removed the envelopes containing the closet bonds from Doyle's office closet and placed them in a safe at the Doyle family home, thereafter notifying either state officials or members of the Minneapolis law firm of Larkin, Hoffman, Daly & Lindgren (LHDL), which firm had represented Doyle on prior occasions, that such bonds had been found. Attorneys from LHDL who were familiar with Doyle's business practices doubted that the persons whose names appeared on the envelopes were actually the owners. After conferring with them, and with John Frundt, now counsel for the closet bond claimants, Doyle's wife, Wanda, delivered the envelopes to LHDL attorneys. Attorneys in that firm held them in their physical possession, pending their commencement of an interpleader action (File No. 3–78 Civil 22). They then deposited the bonds, still in their envelopes, in Court and sought to have this Court determine ownership thereof. They named in the interpleader action all persons whose names appeared on the envelopes, as well as any persons who might lay claim to them ("John Doe"). Subsequently, certain of Doyle's customers who were defendants in the government's interpleader action, intervened in the LHDL action claiming a possible interest in the bonds, and the two actions were consolidated, a Receiver appointed, inventories taken, and a plan for distribution approved.

9. Frundt, present counsel for the closet bond claimants, was present at the Doyle home when the initial disposition of the closet bonds was discussed with members of LHDL and Mrs. Doyle. He insisted that the bonds be deposited in Court. Throughout these proceedings, he has insisted that the closet bonds belong to the persons whose names appeared on the envelopes and that they and the records with respect to accumulating interest and dividends thereon be kept separate from the suitcase bonds. This has been done. Shortly after Doyle was apprehended, counsel for the closet bond claimants secured an affidavit from Doyle wherein Doyle swore that the persons whose names appeared on the envelopes "owned" the bonds contained therein and that he wanted those bonds delivered to those persons. The affidavit did not address the question of commingling, nor the question of whether, if there were inadequate funds to pay back all of his customers, it was Doyle's desire that the closet bond claimants be treated differently than any other claimants herein. By the time the affidavit was prepared, however, the bonds were in the physical possession of LHDL and had been subjected to an IRS levy. Doyle's affidavit was ignored, and the interpleader action was instead begun.

10. Doyle never transferred physical custody or possession of the closet bonds to the closet bond claimants. Nor did he place the closet bonds in a physical location to which the closet bond claimants had free access. To the contrary, the physical possession of the closet bonds, at the time that he left, was in the hands of either his secretary or his family, and no instructions had been given as to what should be done with them. Thereafter, the physical possession of the bonds passed from LHDL to the Receiver.

11. Doyle treated his clients' money and bonds as fungibles and maintained no record from which bondholders could specifically trace and link their bond purchases to a specific identifiable bond.

12. Unlike most of the closet bond claimants, Luella Bleichwehl was the owner of registered securities and mutual funds, as follows:

(a) One Gambles Skogmo $10,000 bond, Bond No. CA1840, which was registered in the name of Bleichwehl's grandson, Scott Ross;

(b) One American Financial Corp, $10,000 bond, Bond No. B40923, which was registered in the name of Bleichwehl's granddaughter, Cynthia Peterson; and

(c) The following shares of Decatur Income Fund: (i) Share No. 59601 for 1,157 shares; (ii) Share No. 61956 for 76 shares; and (iii) Share No. 090394 for 119 shares.

## CONCLUSIONS OF LAW

■ 1. Doyle occupied a position of trust with respect to all his customers and was a fiduciary in whose hands his customers left their purchase money and their bearer bonds. His fiduciary obligations to them included a duty to account to his customers, to keep precise records of ownership and not to wrongfully commingle their assets.

■ 2. Doyle breached these fiduciary obligations and wrongfully commingled his customers' purchase money and bearer bonds leaving no trustworthy records from which it is possible for this Court, or for his customers, including the closet bond claimants, to trace their ownership to specific and particular bonds.

3. Doyle held the bonds, therefore, subject to an equitable lien or constructive trust on all the bonds (both the closet bonds and the suitcase bonds) for the equal *pro rata* benefit of all his customers who make claim herein.

■ 4. The Uniform Commercial Code (UCC) defines "delivery" as a "voluntary transfer of possession". Actual transfer of physical possession is a prerequisite to delivery. Doyle never voluntarily transferred possession of the bonds to the closet bond claimants, and delivery of the closet bonds did not occur simply by leaving them in marked envelopes in his office closet.

■ 5. A "bona fide purchaser" is a "a purchaser for value" who, in good faith and without notice of any adverse claim either (a) has the security registered in his name, (b) takes delivery or (c) is the one to whom the bonds have been transferred as that term is defined in the UCC. M.S.A. § 336.-8–302, 8–313(1)(c), (1)(d)(i) or (1)(g). Neither delivery, registration, nor transfer occurred here. The closet bond claimants were not bona fide purchasers for value who, in addition to acquiring the rights in the bonds which Doyle had or had actual authority to convey (M.S.A. § 336.8–302(3) ), including a claim by the suitcase bond claimants that the "transfer would be wrongful" as to them (M.S.A. § 336.8–302(2) ). The bonds were treated as, and are, fungible assets in which all claimants will share *pro rata*. M.S.A. § 336.8–313(2).

6. The closet bond claimants, except Luella Bleichwehl, are not entitled to priority over Doyle's other customers in these proceedings, but are only entitled to share *pro rata* with all his customers who make claims herein for interest and dividends pursuant to Paragraph 9 of the Court's Order.

7. Luella Bleichwehl, unlike the other bond claimants, was a bona fide purchaser of the following:

(a) On Gambles Skogmo $10,000 bond, Bond No. CA1840, which was registered in the name of Bleichwehl's grandson, Scott Ross;

(b) One American Financial Corp. $10,000 bond, Bond No. B40923, which was registered in the name of Bleichwehl's granddaughter, Cynthia Peterson; and

(c) The following shares of Decatur Income Fund: (i) Share No. 59601 for 1,157 shares; (ii) Share No. 61956 for 76 shares; and (iii) Share No. 090394 for 119 shares.

As such, she is entitled to priority over the other closet bond claimants and the suitcase bond claimants.

## ORDER

Based on the foregoing Findings of Fact and Conclusions of Law,

IT IS ORDERED that the closet bond claimants are denied their claim for priority over other claimants in these proceedings and shall, instead, share *pro rata* with all other claimants who make claim for interest and dividends pursuant to Paragraph 9 of the Court's Order for Distribution dated December 28, 1979, provided, however, that Luella Bleichwehl is entitled to retain the interest she has received and will receive in the future from the issuer on the registered securities and mutual funds listed in Finding of Fact No. 12.

## MEMORANDUM

In order to determine whether the closet bond claimants have priority over the suitcase bond claimants to the *res* of this consolidated interpleader action, the Court must look to the Uniform Commercial Code, Article VIII, Investment Securities. Part Three thereof governs the transfer of securities.

The suitcase bond claimants contend that since the purchase money for both the closet bonds and the suitcase bonds was commingled by Doyle and since the bonds themselves were also commingled by Doyle, the bonds are all part of the same fungible bulk and their owners are, therefore, entitled merely to share in the *pro rata* distribution of the interest under the terms of M.S.A. § 336.8–313(2).

The closet bond claimants insist that since their bonds were placed in envelopes segregating them according to their owners' names and addresses, the bonds were sufficiently identified to constitute delivery of same and claimants thereto were bona fide purchasers within the meaning of M.S.A. §§ 336.8–302 and 336.8–313(1)(d) and (2)[1]. Thus, they claim they are entitled to their bonds, and incidentally to accrued interest, as against the adverse claims of the suitcase bond claimants under the terms of M.S.A. §§ 336.8–301 and 336.8–302(3).

Section 336.8–301 provides that upon transfer of a security to a purchaser, the purchaser acquires the rights in the security which his transferor had the power to con-

vey but only to the extent of the interest transferred.

Section 336.8–302 provides:

"(1) A 'bona fide purchaser' is a purchaser for value in good faith and without notice of any adverse claim:

(a) who takes delivery of a certificated security in bearer form or in registered form, issued or endorsed to him or in blank;

(b) to whom the transfer, pledge, or release of an uncertificated security is registered on the books of the issuer; or

(c) to whom a security is transferred under the provisions of paragraph (c), (d)(i), or (g) of section 336.8–313(1).

"(2) 'Adverse claim' includes a claim that a transfer was or would be wrongful or that a particular adverse person is the owner of or has an interest in the security.

"(3) A bona fide purchaser in addition to acquiring the rights of a purchaser (section 336.8–301) also acquires his interest in the security free of any adverse claim."

■ It is the Court's view that "delivery" under subsection (1)(a) is determined according to the transfer provisions of section 336.8–313(1) and that whatever the traditional definition of "delivery", the plain language of the UCC governs. Thus, in order for the closet bond claimants to have taken their securities free of the adverse claims of the suitcase bond claimants, the transfer must come with the ambit of section 336.8–313(1)(c), (d)(i) or (g).

The closet bond claimants insist that the transfer of their bonds fits the requirements of paragraph (d)(i). That paragraph provides that transfer is deemed to occur

"at the time a financial intermediary . . . sends him confirmation of the purchase and also by book entry *or otherwise* identifies as belonging to the purchaser

(i) a specific certificated security in the intermediary's possession." (Emphasis added.)

---

[1]. As amended and clarified by Laws 1978, ch. 695, § 30, effective January 1, 1979. Subsection (1)(d)(i) to (iii) replaced former subsection (1)(c).

In the instant case, both the closet bond claimants and the suitcase bond claimants furnished funds to Doyle, which Doyle commingled and then used to buy bearer bonds, often of large denomination, which he kept in inventory. Upon receipt of an order from a customer, he then would reissue bonds of smaller denomination if the original bond did not conform to the order. He would then place the bonds into envelopes marked with the name and address of the purchaser, but not the bond number. The purchaser would then be sent a confirmation slip listing issuer, denomination, interest rate and due date, but not the bond number.

As periodic interest came due on the bonds, he would clip the coupons, mail them into the issuers, and after having received the interest payment from the issuer, distribute the interest to the purchasers. Doyle's envelope segregation system and a looseleaf binder constituted his sales records. The destruction of the binder and all envelopes other than those containing the closet bonds resulted in an unreliable indication of bond ownership.

The closet bond claimants' position that the Doyle envelope segregation system is sufficient in the absence of a book entry to identify their bonds is untenable. Unfortunately for the closet bond claimants, Doyle did not place bond numbers on the envelopes. Thus, there is no record to indicate the specific bonds which were held for the customers. Since Doyle retained custody of the envelopes, he was free to, and sometimes did, remove the contents, with or without customers' knowledge or consent, thus destroying whatever identity was given to them by placing them in the envelopes in the first place. Thus, no specific bonds were identified by Doyle as belonging to specific closet bond claimants.

Instead, what Doyle did identify is

"a quantity of securities that constitute or are part of a fungible bulk of certificated securities in the financial intermediary's possession or of uncertificated securities registered in the name of the finan-

cial intermediary . . . ." M.S.A. § 336.8–313(1)(d)(ii).

■ However, a purchaser of such securities cannot be deemed a "bona fide purchaser" under the terms of section 336.8–302(1). Indeed, section 336.8–313(2) specifically provides:

"The purchaser is the owner of a security held for him by a financial intermediary, but cannot be a bona fide purchaser of a security so held except in the circumstances specified in paragraphs (c), (d)(i), and (g) of subsection (1). *If a security so held is part of a fungible bulk, as in the circumstances specified in paragraphs (d)(ii) and (d)(iii) of subsection (1), the purchaser is the owner of a proportionate property interest in the fungible bulk.*" (Emphasis added.)

Plainly, as co-owners with the suitcase bond claimants of a proportionate share of a fungible bulk of securities, the closet bond claimants do not have priority over the suitcase bond claimants. They are entitled only to a *pro rata* share of the distribution.