IN THE MATTER OF HARVEY GOLDBERG, AN ATTORNEY AT LAW.

Argued November 19, 1985—Decided January 22, 1988.

*Robyn M. Hill,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Zulima V. Farber* argued the cause for respondent (*Lowenstein, Sandler, Kohl, Fisher & Boylan,* attorneys).

PER CURIAM.

This matter came before the Disciplinary Review Board (DRB) on a motion for final discipline filed by the Office of Attorney Ethics (OAE) pursuant to Rule 1:20–6(b)(2)(i). The motion was based on respondent's conviction of eleven counts of misapplication of entrusted property, contrary to *N.J.S.A.* 2C:21–15, and eleven counts of theft by failing to make required disposition of property received, contrary to *N.J.S.A.* 2C:20–9.

Respondent was indicted in June 1981 by a Passaic County Grand Jury. He was charged with one count of forgery, twenty-three counts of theft by failure to make required disposition of property received, and twenty-three counts of misapplication of entrusted property. The indictment related to respondent's handling of funds entrusted to him in connection with a series of real estate transactions between December 7, 1979, and May 20, 1980. After respondent entered into a stipulation in which he acknowledged committing the acts alleged in the indictment, the trial was limited to respondent's insanity defense. The jury found him guilty of all counts concerning transactions between December 7, 1979, and April 15, 1980. For all counts concerning transactions between April 21, 1980, and May 20, 1980, however, respondent was found not guilty by reason of insanity.

On March 16, 1982, respondent was sentenced. The sentencing court merged the eleven counts of misapplication of entrusted property into the corresponding theft counts and then sentenced respondent to eleven concurrent terms of imprisonment for four years each and ordered restitution of $291,727.88. The Appellate Division affirmed in an unpublished opinion. We denied certification, *State v. Goldberg*, 94 *N.J.* 617 (1983). Respondent began serving his custodial sentence in December 1983 and, following his enrollment in the Intensive Supervision Program, was released from custody on April 24, 1984.

Pursuant to a consent order, respondent was temporarily suspended from the practice of law on August 18, 1980.

The DRB concluded that respondent's criminal conviction "established that he had engaged in illegal conduct which adversely reflected on his fitness to practice law because of dishonesty, fraud, deceit, or misrepresentation" in violation of Disciplinary Rule 1–102(A)(3)(4).[1] Accordingly, by the requisite majority, the Board recommended that respondent be permanently disbarred. One member of the DRB dissented. He contended that because respondent had been partially successful at trial in raising an insanity defense based on the condition of compulsive gambling, the question whether or not compulsive gambling should be recognized as a mitigating factor in a disciplinary hearing "is a question which must be resolved by judicial determination."

I

In disciplinary proceedings against an attorney, a criminal conviction is conclusive evidence of a respondent's guilt. *R.* 1:20–6(b)(1); *Matter of Litwin*, 104 *N.J.* 362, 364–65 (1986).

---

[1] Effective September 10, 1984, the Rules of Professional Conduct of the American Bar Association, as modified by this Court, govern the conduct of the members of the bar of this State. *R.* 1:14. Respondent's actions occurred prior to this date, and are consequently governed by the Disciplinary Rules then in force.

Thus, conviction of a crime conclusively establishes the facts on which the conviction is based. The sole issue to be determined is "the extent of final discipline to be imposed," *R.* 1:20–6(b)(2)(ii); *In re Kushner,* 101 *N.J.* 397, 400 (1986). There is no need to make an independent examination of the underlying facts, *In re Bricker,* 90 *N.J.* 6, 10 (1982), but those facts may be relevant to the nature and extent of discipline ultimately imposed. *In re Rosen,* 88 *N.J.* 1 (1981).

We have independently examined the record and we are satisfied that the facts found by the DRB are supported by clear and convincing evidence. Respondent was admitted to the bar in 1960. By his own admission, during the early years of his legal career he "started gambling five times more than [he] was making." Soon, he recalled, "every day became a gambling day. Every vacation became a gambling vacation." At first respondent funded this activity through his earnings. Then after exhausting all family savings, he began to borrow "from banks and other sources." At trial, respondent admitted he had used clients' trust funds since 1975 for gambling. He continued these activities undetected by covering his transactions with his winnings or by using funds from new clients to pay back the old accounts before those funds were needed. The trial court concluded:

> The type of method that Mr. Goldberg used was a method that takes a great deal of thinking, a great deal of expertise and Mr. Goldberg had that thinking and had that expertise, because as a member of the Bar and being an expert—and there's no doubt about it, he was an expert on real estate transactions—he knew just how long he could hold back paying off mortgages and when he was put to the wall, he would go to the next transaction, a more recent transaction and take that money to make good for the older transaction. That was a conscious covering up of the losses as he went along, until it got to a point where no longer could he cover up and no longer could he put people off * * *.

The trial court also noted that respondent calculated he had gambled and lost over a million dollars.

Respondent was convicted for violating *N.J.S.A.* 2C–20—9, which provides, in pertinent part, that:

> A person who *purposely* obtains or retains property * * * subject to a *known* legal obligation to make specified payment * * * is guilty of theft if he *deals with* the property obtained *as his own* and fails to make the required payment or disposition * * *. [Emphasis added.]

Respondent was also convicted of violating *N.J.S.A.* 2C:21–15, which states:

> A person commits a crime if he applies or disposes of property that has been entrusted to him as a fiduciary * * * in a manner which he *knows is unlawful* and involves a substantial risk of loss or detriment to the owner of the property or to a person for whose benefit the property was entrusted * * *. [Emphasis added.]

As is readily apparent from the statutory language, intent is an essential element of each of the offenses for which respondent was convicted.

Respondent's criminal conduct, as detailed in the indictment, began in December 1979 and continued to May 1980. The transactions that supported his convictions occurred between December 7, 1979, and April 15, 1980. Therefore, the mandate of *In re Wilson*, 81 *N.J.* 451 (1979), which was decided on December 19, 1979, controls our determination of final discipline. In *Wilson* we announced that when an attorney knowingly uses a client's money as if it were his or her own, disbarment will generally follow, and that "[w]e foresee no significant exceptions to this rule and expect the result to be almost invariable." *Id.* at 453. Recently we noted that although we indicated in *Wilson* "that disbarment for *knowing* misappropriation shall be 'almost invariable,' the fact is that since *Wilson*, it has been invariable." *Matter of Noonan*, 102 *N.J.* 157, 160 (1986) (footnote omitted; emphasis added).

We have indicated that there may be circumstances in which an attorney's loss of competency, comprehension, or will may be of such a magnitude that it would excuse or mitigate conduct that was otherwise knowing and purposeful. *In re Jacob*, 95 *N.J.* 132, 137 (1984).

Before the DRB and again before us, counsel for respondent has argued that this case is exceptional, and the mitigating circumstances are such that the *Wilson* mandate of disbarment

is inappropriate and should not be applied here. She submits that respondent's offenses "unquestionably resulted from his pathological gambling." The OAE contends that we should not independently consider such a factor in mitigation because that argument was the basis of respondent's partially unsuccessful defense to the criminal conviction, *i.e.*, that he was not guilty because of a condition of insanity that resulted from his compulsive gambling. Because this defense, at least as it related to some of the misappropriations, was rejected by the jury, the OAE asserts that respondent is foreclosed from raising it in this proceeding.

Our Court Rules anticipate disciplinary proceedings that follow a respondent's criminal convictions. Rule 1:20–6(b)(2)(ii) states:

> The sole issue to be determined shall be the extent of final discipline to be imposed. At the date set for oral argument by the Board or the Court any relevant evidence in mitigation *that is not inconsistent with the essential elements of the criminal matter for which the attorney was convicted* as determined by the statute defining the criminal matter shall be admissible. No witnesses shall be allowed and no oral testimony shall be taken; however, both the Board and the Court may consider written materials otherwise allowed by this rule that are submitted to it. Either the Board or the Court, upon the showing of good cause therefore or on its own motion, shall remand a case to a Committee for a limited evidentiary hearing and report consistent with this subsection. [Emphasis added.]

This rule codified long-standing case law to the same effect. *See In re Addonizio*, 95 *N.J.* 121, 123 (1984); *In re Infinito*, 94 *N.J.* 50, 57 (1983); *In re Mischlich*, 60 *N.J.* 590, 593 (1972); *In re Isserman*, 9 *N.J.* 269, 277 (1952). As noted above, intent was an essential element of the crimes respondent was found guilty of committing. The OAE argues that the "evidence" respondent seeks to offer in this disciplinary proceeding is "inconsistent" with the jury's finding that respondent possessed the requisite state of mind to warrant his conviction.

■ We choose, however, to review independently the expert testimony submitted by both respondent and the State at trial to ascertain whether or not respondent, at the time of the misappropriations, "suffered a loss of competency, comprehension or will of a magnitude" sufficient to meet the exculpatory

standard set forth in *Jacob*.  In doing so, we are mindful of prior instances when we have carefully measured other proffers of mitigating circumstances against the *Jacob* standard. In *Matter of Hein*, 104 *N.J.* 297 (1986), *Matter of Romano*, 104 *N.J.* 306 (1986), and *Matter of Canfield*, 104 *N.J.* 314 (1986), respondents offered evidence of alcohol or drug dependency as a mitigating factor for their admitted misappropriation of client funds.  Although we rejected each proffer, we noted our awareness of the debilitating consequences of alcoholism and drug addiction, acknowledging that the public policy of the State of New Jersey recognizes alcoholism as a disease and an alcoholic as a sick person.  *Hein, supra*, 104 *N.J.* at 302.  We indicated then that there may be circumstances in which an attorney's alcohol or drug condition causes such a loss of competency, comprehension, or will that conduct that was otherwise knowing and purposeful would be excused or mitigated.  *Id.* at 304.

We noted in *Romano* that "[i]n some respects [a case involving drug addiction], like those involving alcoholism or gambling, is a modern American tragedy."  104 *N.J.* at 309. This case represents the first time we have directly addressed the issue of compulsive gambling in the context of a misappropriation case.  Guided by our approach in *Hein*, we conclude that when tested against the *Jacob* standard, the proofs offered at respondent's trial do not demonstrate a loss of competency, comprehension, or will sufficient to excuse respondent's misconduct.

At respondent's trial, three psychiatric experts testified, two for respondent and one for the State.  Both of respondent's experts described the seemingly inexorable progression of respondent's compulsion to gamble until "he got to the point where he could not clearly make good decisions about his family, his work, and his social activities because gambling came first * * *."

However, one of respondent's own experts testified that during the relevant period of time, respondent was aware of both the nature and quality of his acts.  It is also clear that

respondent comprehended what he was doing with his clients' trust funds. He knew he was using clients' funds for his own purposes. Respondent's experts contended that respondent did not think this conduct was improper because he believed he was going to replace what he took with the winnings he believed he would generate from his gambling. Indeed, even at the very end, when respondent could no longer stay ahead of himself in the manipulation of his client trust funds, he was attempting to restore money to the depleted accounts. Considered in light of the three characteristics emphasized in *Jacob* —competency, comprehension, and will—the thrust of respondent's expert testimony was that respondent's *will* was overborne by his compulsion to gamble. However, we note that respondent's experts could not and did not contend that respondent's compulsion to gamble created an uncontrollable urge to misappropriate his clients' funds.

What is most significant about respondent's behavior during the critical period is the degree of control he exercised over his personal and professional finances. He orchestrated his client accounts in a fashion that revealed a high degree of competency and comprehension. Moreover, respondent did not indiscriminately devote all of his personal assets to his gambling compulsion. It is significant that even as his need to gamble reached its most destructive level, respondent continued to screen off several family assets as a source for gambling funds.

It is extremely difficult to understand the psychological condition of a compulsive gambler. We do not hold here that compulsive gambling can *never* impair an individual's state of mind to such an extent that he or she is incapable of understanding the nature of his or her actions or lacks the capacity to form the intent requisite for a "knowing misappropriation" of a client's funds. Indeed, the jury in respondent's criminal case found that respondent did in fact suffer a deficiency of similar magnitude for at least part of the time period relevant to this matter. Nor do we hold that the compulsive gambling condition in its most extreme form could result in sufficient impair-

ment of an attorney's will to constitute a defense to a charge of knowing misappropriation. Our holding in this case is that this record does not reflect an impairment of respondent's will sufficient to excuse or mitigate the knowing misappropriation of clients' funds.

As we stated in *Hein*, "[w]e have only the legal standard to guide us. We wish we knew more." 104 *N.J.* at 303. We acknowledge that compulsive gambling has been classified as a mental illness by the American Psychiatric Association. *DSM–III: Diagnostic and Statistical Manual of Mental Disorders*, 291–3, American Psychiatric Association (3d ed. 1984). We encourage the New Jersey State Bar Association to lend its support to efforts by the Council on Compulsive Gambling of New Jersey to promote a better understanding of the causes and effects of this condition on members of the legal profession.

██ Our primary goal in these proceedings is not to punish the individual attorney, but to protect the integrity of our profession. We acknowledge that respondent has embarked upon an apparently successful road to rehabilitation and is actively involved with Gambler's Anonymous. Although respondent has agreed to make full restitution, we observe that the client misappropriations in this case exceeded $600,000.[2] Our understanding of the compulsive behavior that led to these misappropriations cannot result in "lowering the barriers to the protection we have attempted to give to that portion of the public who are clients, especially clients who entrust their money to lawyers." *Hein, supra,* 104 *N.J.* at 304.

For all the foregoing reasons, we conclude that the appropriate discipline is disbarment. Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs.

---

[2]This was the aggregate amount of misappropriation for which respondent was indicted. The amount for which he was convicted, because he was found not guilty on some counts, was $291,727.88.

*For disbarment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

It is ORDERED that HARVEY GOLDBERG of CLIFTON, who was admitted to the bar of this State in 1960, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that HARVEY GOLDBERG be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.