In re Harvey GOLDBERG, Debtor,

v.

NEW JERSEY LAWYERS' FUND FOR
CLIENT PROTECTION and Chicago
Title Insurance Company.

Chicago Title Insurance
Company, Appellant.

No. 90–5757.

United States Court of Appeals,
Third Circuit.

Argued Feb. 4, 1991.

Decided May 8, 1991.

Walter J. Fleischer, Jr. (Argued), Shanley
& Fisher, Somerville, N.J., for appellant
Chicago Title Ins. Co.

Daniel R. Hendi (Argued), Richard J.
Hughes Justice Complex, Trenton, N.J., for
appellee New Jersey Lawyer's Fund for
Client Protection.

Before MANSMANN and SCIRICA,
Circuit Judges, and POLLAK, District
Judge.*

---

* The Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This dispute in bankruptcy concerns whether one or both parties is entitled to proceeds from an Attorney Trust Account. Debtor Harvey Goldberg was a New Jersey attorney who misappropriated money entrusted to him by his clients. The New Jersey Lawyers' Fund for Client Protection[1] and Chicago Title Insurance Company each claimed all or part of the remaining balance in Goldberg's Attorney Trust Account for reimbursements made to cover the losses suffered by Goldberg's clients. The district court held that the Client Protection Fund should be the sole recipient of Goldberg's Attorney Trust Account proceeds. We will reverse and remand for proceedings consistent with this opinion.

### I.

On August 18, 1980, Goldberg was temporarily suspended from the practice of law and on January 22, 1988 he was disbarred. *In re Goldberg*, 109 N.J. 163, 172, 536 A.2d 224, 228 (1988). The disbarment resulted from a criminal conviction related to Goldberg's misappropriation of funds entrusted to him in a series of real estate transactions occurring between December 7, 1979 and May 20, 1980. On May 28, 1980, Richard Roth, President of the Passaic County Bar Association, took possession, as conservator, of Goldberg's practice, files, Attorney Trust Account, and Attorney Business Account. On July 25, 1980, Roth was appointed Custodial Receiver under New Jersey Court Rule 1:28-8 to take control of Goldberg's assets.

Every attorney who practices in New Jersey is required, under New Jersey Court Rule 1:21-6(a),[2] to maintain at least two bank accounts, one designated an Attorney Trust Account and the other an Attorney Business Account. The purpose of these accounts is to aid the New Jersey Supreme Court's "supervisory control" over the practice of law. *In re Jaffee*, 74 N.J. 86, 90, 376 A.2d 1181, 1183 (1977).

The funds in the Attorney Trust Account, which are held in trust by the attorney for his client, remain the property of the client until they are withdrawn for their intended purpose (*e.g.*, paying off mortgages). *In re Goldberg*, No. 89-1441, slip op. at 9-10 (D.N.J. July 23, 1990). The Attorney Trust Account must be separate from the attorney's business or personal accounts or any other fiduciary account that the attorney may maintain as an executor, guardian, trustee, receiver, or comparable fiduciary. The Attorney Business Account should contain all funds that the attorney received for professional services.

Both the Attorney Trust Account and the Attorney Business Account must be prominently labelled and maintained according to the bookkeeping requirements set forth un-

---

1. The New Jersey Lawyers' Fund for Client Protection was formerly named the Clients' Security Fund of the Bar of New Jersey.

2. New Jersey Court Rule 1:21-6 states in part:
 (a) Required Bank Accounts. Every attorney who practices in this state shall maintain in a financial institution in New Jersey ...
 (1) a trustee account or accounts, separate from any business and personal accounts and from any fiduciary accounts that the attorney may maintain as executor, guardian, trustee, or receiver, or in any other fiduciary capacity into which trustee account or accounts funds entrusted to the attorney's care shall be deposited; and
 (2) a business account into which all funds received for professional services shall be deposited.
 Other than fiduciary accounts maintained by an attorney as executor, guardian, trustee, or receiver, or in any other similar fiduciary capacity, all trustee accounts, whether general or specific, as well as all deposit slips and checks drawn thereon, shall be prominently designated as an "Attorney Trust Account." Nothing herein shall prohibit any additional descriptive designation for a specific trust account. All business accounts, as well as all deposit slips and all checks drawn thereon, shall be prominently designated as either an "Attorney Business Account," an "Attorney Professional Account" or an "Attorney Office Account."
 (c) Type and Availability of Bookkeeping Records.... When made available pursuant to this rule, all such books and records shall remain confidential except for the purposes thereof or by direction of the Supreme Court, and their contents shall not be disclosed by anyone in such a way as to violate the attorney-client privilege.
 N.J.Ct.R. 1:21-6 (1990).

der New Jersey Court Rule 1:21–6. Goldberg maintained an Attorney Trust Account for his real estate practice and labelled it as such ("Harvey Goldberg Trust Account").

Real estate settlements in New Jersey are conducted two different ways. In northern New Jersey, settlements are handled by attorneys who are approved by title companies to collect and distribute funds entrusted to them by mortgage lenders. In southern New Jersey, settlements are handled by title insurance agents who distribute the necessary settlement funds. Goldberg practiced law in northern New Jersey.

Beginning in 1975, Goldberg misappropriated funds from his Attorney Trust Account and other accounts for gambling. His actions remained undetected because he replaced misappropriated funds with his winnings or funds from new clients. In a typical transaction with one of Chicago Title's defrauded insureds, Goldberg would represent the insured at the real estate closing. The mortgagee would advance funds to Goldberg with instructions to pay off an existing prior mortgage. Instead of paying off the mortgage, Goldberg would make personal use of the funds. *In re Goldberg*, 12 B.R. 180, 182 (Bankr.D.N.J. 1981). In these cases, he relied on his real estate expertise to calculate how long he could delay paying off the mortgages. When pressed for payment, he would replace funds taken from an older account with money received from a more recent transaction. *In re Goldberg*, 109 N.J. at 166–67, 536 A.2d at 225. Under their policies, Chicago Title reimbursed the mortgagee banks for the amounts that they were defrauded, thereby fulfilling their obligations to their insureds.

On September 26, 1980, an involuntary petition in bankruptcy under Chapter 7, 11 U.S.C. § 303, was filed against Goldberg by, among others, Chicago Title. That same day, Chicago Title filed a complaint in bankruptcy contending, among other things, that it had paid in excess of $170,-000 for claims filed by five of its insureds. It sought a declaration that Goldberg's debt be nondischargeable and requested relief from the automatic stay provisions of 11 U.S.C. § 362. As a result, on October 7, 1980, Roth turned over to the bankruptcy trustee all of Goldberg's files, records, and funds from his frozen Attorney Trust Account (about $33,000) and his Attorney Business Account (about $11,000).

On April 9, 1981, the bankruptcy court declared the entire debt to Chicago Title nondischargeable under 11 U.S.C. § 523(a)(4)[3] because it was incurred through Goldberg's fraud and embezzlement while acting in a fiduciary capacity. However, the court denied Chicago Title's motion for relief from the stay for insufficient cause and because the stay offered protection for other creditors.

On March 4, 1981, Chicago Title again sought relief from the automatic stay and made additional claims against Goldberg. After trial of Chicago Title's September, 1980 and March, 1981 complaints, the bankruptcy judge granted relief from the automatic stay, and found Goldberg's debt to Chicago Title nondischargeable for the sum of $264,546.95.

On May 18, 1981, the Client Protection Fund also filed a complaint against Goldberg. On March 13, 1985, the bankruptcy court found Goldberg's debt to the Client Protection Fund in the amount of $137,615.21 nondischargeable under 11 U.S.C. § 523(a)(4) and 11 U.S.C. § 727.

Since the time that Roth turned over the funds to the bankruptcy trustee, Goldberg's Attorney Business Account, which was deposited in his general bankruptcy estate account, increased in value because of interest and other funds that the bankruptcy trustee recouped. Goldberg's Attorney Trust Account increased solely because of interest. On

---

**3.** Section 523(a)(4), Exceptions to Discharge, states:

(a) A discharge under … this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

11 U.S.C. § 523(a)(4)(1988).

March 8, 1988, the bankruptcy trustee advised the Client Protection Fund that he was holding $91,924.99 in Goldberg's general bankruptcy estate account and $57,-692.95 in Goldberg's Attorney Trust Account.

On March 23, 1988, the Client Protection Fund sought release of the Attorney Trust Account proceeds from the bankruptcy court. Chicago Title filed a cross-motion for release of the same funds. The bankruptcy trustee took a neutral position on the distribution of the trust funds and filed no pleadings.

On September 30, 1988 the bankruptcy court issued an opinion and on November 30, 1988 it entered an order denying both motions. The bankruptcy court held that it was "uncontested that the funds in question were on deposit in [Goldberg's] Attorney Trust Account." *In re Goldberg*, No. 80–03994, slip op. at 5 (Bankr.D.N.J. Sept. 30, 1988). Moreover, the funds, which are held in trust by an attorney for his client, "remain as property of the client until they are withdrawn from the account for the purpose for which the funds are held." *Id.* at 6.

However, the court concluded that neither the Client Protection Fund nor Chicago Title was entitled to an equitable lien upon the funds. Instead, the funds in the Attorney Trust Account, plus interest, were to be included as an asset of Goldberg's general bankruptcy estate subject to the claims of the general creditors. The bankruptcy court's conclusion was based upon the apparent inability of either the Client Protection Fund or Chicago Title to trace the funds in the Attorney Trust Account to any particular client because Goldberg had commingled his own money with the funds of his clients. Both parties appealed to the district court.

The district court reversed the bankruptcy court, finding that the Client Protection Fund was entitled to all of Goldberg's At-torney Trust Account proceeds. The district court based its decision on a number of factors, most importantly, its conclusion that the bankruptcy court had misapplied the tracing requirement and had incorrectly determined that the money deposited in the Attorney Trust Account was the property of Goldberg's general bankruptcy estate. As the district court explained, "such a particularized tracing is not necessary. Rather, all that need be shown is that the client's interests are traceable to a separate, identifiable account." *In re Goldberg*, No. 89–1441, slip op. at 14 (footnote omitted).

Although the district court agreed with the bankruptcy court that the funds in the Attorney Trust Account belonged to Goldberg's clients, the district court determined that Goldberg's commingling of his own funds with those in the Attorney Trust Account "did not work to dissipate his client's equitable interests in that account. It is a well-settled principle of law that 'where a fiduciary com[m]ingles trust funds with his own, equity imposes a trust upon *the entire fund.*'" *Id.* at 10 (citation omitted).

The district court emphasized Goldberg's statement at trial that he paid money into his Attorney Trust Account to pay back the funds that he had misappropriated from his clients. "Indeed, even at the very end, when respondent could no longer stay ahead of himself in the manipulation of his client trust funds, he was attempting to restore money to the depleted accounts." *Id.* at 18 (emphasis omitted) (*citing In re Goldberg*, 109 N.J. at 171, 536 A.2d at 227).

The district court concluded that because the money was deposited into the Attorney Trust Account on behalf of Goldberg's clients, his clients were therefore entitled to an equitable lien upon all the remaining funds. As a result, the Client Protection Fund, which reimbursed Goldberg's clients pursuant to New Jersey Court Rule 1:28 [4]

---

4. New Jersey Court Rule 1:28 concerning the purpose and administration of the Clients' Security Fund, states in part:

(a) Administration. The Supreme Court shall appoint 6 trustees to administer and oper-ate, in accordance with these rules, the Clients' Security Fund of the Bar of New Jersey, whose purpose is the reimbursement, to the extent and in the manner provided by these rules, of losses caused by the

and was subrogated to their rights, was entitled to the entire Attorney Trust Account. In contrast, the district court held that Chicago Title was not entitled to any part of the Attorney Trust Account because its mortgage lender insureds were not clients. Therefore Chicago Title had not sufficiently demonstrated an attorney-client relationship with Goldberg under New Jersey Court Rule 1:21–6. The court also concluded that Chicago Title could not prove that Goldberg had deposited any of the money of its insureds into his Attorney Trust Account.

On appeal, Chicago Title agrees that the district court properly determined that the Attorney Trust Account balance of $57,-692.95 should not be part of Goldberg's general bankruptcy estate account and that the bankruptcy court incorrectly applied the tracing requirement. However, Chicago Title contends that the Client Protection Fund should not be the sole recipient of the Attorney Trust Account. Instead, the Attorney Trust Account should be apportioned so that Chicago Title would receive 65 percent and the Client Protection Fund would receive 35 percent, based upon their respective portions of the total proceeds that they have requested ($264,546.95 and $137,615.21, which total $402,162.16). According to Chicago Title, this proposal is based upon an agreement between it and the Client Protection Fund to distribute funds from Goldberg's newly earned income when Goldberg was put on probation. The Client Protection Fund maintains that the 65%–35% ratio is irrelevant because it was developed for a different purpose than the issue in this case.[5]

## II.

We review findings of fact under a clearly erroneous standard. Our review of conclusions of law is plenary. *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir.1986); *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101–02 (3d Cir.1981). Having affirmed the bankruptcy court's factual finding that

---

dishonest conduct of members of the Bar of this State.

N.J.Ct.R. 1:28–1(a) (1990).

(a) Eligible Claims. The Trustees may consider for payment all claims resulting from the dishonest conduct of a member of the bar of this state acting either as an attorney or fiduciary, provided that:

(1) Said conduct was engaged in while the attorney was a practicing member of the Bar of this State;

(2) On or after January 1, 1969, the attorney has been suspended, disbarred or placed in disability inactive status, has resigned with prejudice or pleaded guilty to, or been convicted of embezzlement or misappropriation of money or other property.

 . . . .

(b) Consideration of Claims. The trustees in their sole discretion but on the affirmative vote of 4 of them shall determine which eligible claims merit reimbursement from the Fund and the amount, time, manner, conditions and order of payment of reimbursement. In making such determinations the trustee shall consider, among other appropriate factors, the following:

(1) The amounts available and likely to become available to the Fund for the payment of claims and the size and number of claims which are likely to be presented;

(2) The amount of the claimant's loss as compared with the amount of losses sustained by other eligible claimants;

(3) The degree of hardship suffered by the claimant as a result of the loss;

(4) The degree of negligence, if any, of the claimant which may have contributed to the loss;

(5) The potential for recovery from a collateral source;

(c) Limitation on Payments. The trustees shall, by regulation, fix the maximum amount of which any one claimant may recover from the Fund and the aggregate maximum amount which may be recovered because of the dishonest conduct of any one attorney.

 . . . .

N.J.Ct.R. 1:28–3(a)–(c) (1990) (emphasis added).

**5.** The Client Protection Fund contends that it did not pay interest on the claims since it only reimbursed defrauded clients for their losses and nothing more under New Jersey Court Rule 1:28–3. It did not reimburse for losses arising out of the negligent conduct of an attorney. Chicago Title indemnified its insured lenders under its contract of protection against the fraudulent acts of its approved attorney, Goldberg. Chicago Title's judgment against Goldberg, a total of $264,546.95, represented the sum that Chicago Title paid to protect the lien position of its insureds, not the actual amount that Goldberg misappropriated.

Goldberg's Attorney Trust Account funds could not be traced to particular clients, the district court considered the "narrow legal question of what should be done with funds in the absence of any clear facts indicating from whence they came." *In re Goldberg*, No. 89–1441, slip op. at 8. We have plenary review of the district court's determination of this question.

### III.

As we have noted, the district court found that the Client Protection Fund is entitled to the entire proceeds of the Attorney Trust Account because it reimbursed Goldberg's "clients," not insureds, and that Chicago Title should receive nothing. *See generally Trustees of Clients' Security Fund of the Bar v. Miller*, 243 N.J.Super. 75, 83–85, 578 A.2d 887, 892–93 (1989) (discussing Clients' Security's subrogation rights). The district court's holding is based upon several conclusions: (1) the money in the Attorney Trust Account belongs only to Goldberg's clients; (2) Chicago Title's insureds are not clients; and therefore (3) Chicago Title, whose rights are subrogated to those of its insureds, is not entitled to any of the money in the Attorney Trust Account. We believe, however, that the district court erred in its conclusions that the Attorney Trust Account funds belonged only to the Client Protection Fund.

### A.

The Bankruptcy Code does not discharge an individual debtor from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. 523(a)(4). The bankruptcy court found that Goldberg's fiduciary obligations to Chicago Title as well as to the Client Protection Fund, met the criteria to establish a fiduciary relationship under 11 U.S.C. § 523(a)(4). With respect to Chicago Title in particular, the bankruptcy court stated that Goldberg acted as the company's "approved attorney" who performed different services for the company and its mortgage lenders. Although not "strictly clients," the court said that Goldberg had reason to believe that Chicago Title and its insureds were relying on him. It is clear that he misappropriated the Chicago Title funds entrusted to him. *In re Goldberg*, at 183.

We recognize that some courts have considered that the criteria for establishing a "fiduciary capacity" under 11 U.S.C. § 523(a)(4) are generally more narrow than those criteria comprising the broader meaning of fiduciary as a relationship involving trust, good faith, and confidence. *See, e.g.*, *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir.1986) (stating that the "broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context"); *In re Gans*, 75 B.R. 474, 489 (Bankr.S.D.N.Y.1987) (addressing a concern that the definition of fiduciary for purposes of discharge be narrowly construed to preclude "commercial debtor-creditor transactions in which the debtor merely violated the terms of his agreement with the creditor"); *In re Rausch*, 49 B.R. 562, 564 (Bankr.D.N.J.1985) (holding that the general meaning of fiduciary as a person representing confidence, trust, and good faith is "far too broad for the purposes of bankruptcy law").

However, we do not believe that this distinction applies to the facts of this case or to our determination of which party is entitled to the proceeds of the Attorney Trust Account. Even under a narrow definition, both the Client Protection Fund and Chicago Title are fiduciaries under the Bankruptcy Code.

Both the Client Protection Fund and Chicago Title have similar relationships with their respective clients and stand in comparable positions. The Client Protection Fund was created "in order to provide protection for the clients of all practicing attorneys" in the state, N.J.Ct.R. 1:28–8, Comments at 241 (1990), by way of the reimbursement of losses caused by attorneys' "dishonest conduct." N.J.Ct.R. 1:28–1(a) (1990). At present, the Rules require that each practicing attorney in the state annually contribute to the Client Protection Fund a set sum determined by the New Jersey Supreme Court each year. N.J.

Ct.R. 1:28–2. The New Jersey Bar has compared the Client Protection Fund with the role of an insurer noting that "there is a commonly held notion that insurance or bonding are an effective and less costly substitute" for a Client Protection Fund. *Report of the Select Committee to Review Standards for Safeguarding Clients Property*, 112 N.J.L.J. 681A, 681B (1983) [hereinafter *Committee Report*]; *see, e.g., Davis v. Board of Medical Examiners*, 497 F.Supp. 525, 530 (D.N.J.1980) (discussing the overlaps and potential conflicts between protection from a clients' security fund and that from professional health liability insurance). In this case, the Client Protection Fund reimbursed its clients for the losses that they incurred by entrusting their funds to Goldberg. Similarly, Chicago Title's insureds entrusted their funds to Goldberg so that he would pay off prior mortgages. Chicago Title replaced the funds with its own money by paying off the prior mortgages.

We find it significant that both the Client Protection Fund and Chicago Title paid similar types of claims. Goldberg's law practice concentrated on real estate. The only active files found in his office by the conservator on May 29, 1980 involved real estate matters. Of the 17 "exemplary claims" that the Client Protection Fund submitted to demonstrate the kinds of reimbursements it made to Goldberg's clients, nearly all involved proceeds given to Goldberg for real estate transactions. This distribution is consistent with the finding that "the bulk of clients' losses occasioned by lawyer theft are related to the handling of clients' funds generated by real estate closings or those generated by the disbursement of the proceeds of negligence cases." *Committee Report, supra,* at 681B.

Without Chicago Title's coverage, its insureds could have become the Client Protection Fund's clients because they would no longer have had a collateral source for their claims. Indeed, the bankruptcy judge recognized that "the payment by Chicago and other title companies had the effect of reducing claims against the Fund." *In re Goldberg*, No. 80–03994, slip op. at 12. Un-

der these circumstances, Chicago Title's rights can be derived from those of its insureds. But for the fact that Chicago Title is an insurance company, it also would have been eligible for reimbursement from the Client Protection Fund. *See, e.g., In re Tooks*, 76 B.R. 162, 163 (Bankr.S.D.Cal. 1987) (describing a clients' security fund provision of partial reimbursement to Prudential for an 11 U.S.C. § 523(a)(4) claim).

### B.

The district court also concluded that Chicago Title was not a proper recipient of Goldberg's Attorney Trust Account because in contrast to the Client Protection Fund, its association with its insureds was not part of an attorney-client relationship as is required by New Jersey Rule 1:21–6(a)(1). *In re Goldberg*, No. 89–1441, slip op. at 18, 20 n. 4. We find no authority in the Bankruptcy Code or elsewhere indicating that New Jersey Court Rule 1:21–6 would prohibit recovery by a claimant in Chicago Title's position for proceeds deposited in an Attorney Trust Account. The Rule makes no reference to an "attorney-client trust account," as the district court so labelled it, nor does it draw distinctions between funds that are "entrusted" and those that are held for "clients." Instead, the Rule refers only to "funds entrusted to an attorney's care," with certain fiduciary capacity exceptions that are not relevant to Chicago Title (*e.g.,* accounts maintained as executor, guardian, trustee, or in any other comparable fiduciary status). Under New Jersey Court Rule 1:21–6, Goldberg was a fiduciary to both the Client Protection Fund and Chicago Title. *See also In re Conroy*, 56 N.J. 279, 284, 266 A.2d 279, 282 (1970) (stating that "funds in the hands of an attorney that belong to a client *or others* must be kept inviolate") (citation omitted, emphasis added).

### C.

■ The district court concluded that the bankruptcy court erred in its interpretation of the tracing requirement, and held that the Attorney Trust Account should not be

part of Goldberg's general bankruptcy estate. *In re Goldberg,* No. 89–1441, slip op. at 16–17. That issue was not appealed and is not now before us. Moreover, we agree that whatever funds that Goldberg added to the Attorney Trust Account to compensate for what he misappropriated became a part of the Attorney Trust Account. *See, e.g., In re California Trade Technical Schools v. United States,* 923 F.2d 641, 646 (9th Cir.1991) (stating that deposits by way of restitution become trust funds); G. Bogert, *Trusts and Trustees* § 162 (6th ed. 1987) (noting that a trustee's later deposits of his own money in a trust account are not presumed to be restitution for his stolen funds unless the account is explicitly labelled a trust account).

However, we cannot agree that the funds in the Attorney Trust Account belonged only to the Client Protection Fund. First, the bankruptcy court correctly determined that although the funds had been deposited in the Attorney Trust Account, neither the Client Protection Fund nor Chicago Title could trace the funds to a particular client. Goldberg's accounting in this case is consistent with the circumstances described by the *Committee Report:* "In the experience of the trustees of [the Client Protection Fund] and the Disciplinary Review Board, lawyers who get in money trouble do not maintain their records in compliance with R. 1:21–6. Nationally, the experience has been that the records of lawyers who steal from their clients are generally in disarray." *Committee Report, supra,* at 681A. For these reasons, firm determinations of priority in apportioning the funds are difficult.

 In order to establish rights as a trust recipient, a claimant must make two showings: (1) demonstrate that the trust relationship and its legal source exist, and (2) identify and trace the trust funds if they are commingled. Whereas the first showing is generally a question of state law, the second showing "because it pertains to distribution of assets from an entity in federal bankruptcy proce[e]ding, is exclusively a question of federal law." *Connecticut Gen. Life Ins. Co. v. Univer-*

*sal Ins. Co.,* 838 F.2d 612, 618–19 (1st Cir.1988); *see also In re Kennedy & Cohen, Inc.,* 612 F.2d 963, 965–66 (5th Cir.) (giving effect to state law that might be contrary to federal law "would open the door to state creation of priorities in favor of various classes of creditors") (*citing Elliott v. Bumb,* 356 F.2d 749, 754–55 (9th Cir.), *cert. denied,* 385 U.S. 829, 87 S.Ct. 67, 17 L.Ed.2d 66 (1966)), *cert. denied,* 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980). Therefore, we look to federal law for guidance in determining whether the Client Protection Fund should have priority in the distribution of the Attorney Trust Account funds. We rely on state law to the extent that it does not conflict with federal law.

 In general, courts favor a pro rata distribution of funds when such funds are claimed by creditors of like status. *See, e.g., Provencher v. Berman,* 699 F.2d 568, 570 (1st Cir.1983) (taking a proportionate share of property purchased with commingled funds); *Commodity Futures Trading Comm'n v. Franklin,* 652 F.Supp. 163, 168 (W.D.Va.1986) (applying a formula to divide varying sources of commingled funds because "equity dictates that all ... funds be distributed on a pro rata basis"), *rev'd on other grounds,* 875 F.2d 76 (4th Cir. 1989); *In re Leedy Mortgage Co.,* 111 B.R. 488, 489 (Bankr.E.D.Pa.1990) (disallowing differential distribution of funds based on the "precept that preferences or priorities to creditors should be carefully assessed and allowed only when legally or equitably justified"); *In re Independence Land Title Corp. of Ill.,* 18 B.R. 673, 674 (Bankr.N.D. Ill.1982) ("[I]t would thwart the general bankruptcy principle of equality of distribution to creditors of equal status if this court allowed [defendant] to receive all the funds held by the trustee."); *In re Johnson,* 121 N.J. 244, 244, 579 A.2d 815, 815 (1990) (holding that, in a case where a suspended attorney commingled funds between his Attorney Trust Account and Attorney Business Account, and the funds could not be traced, claimants State of New Jersey and Clients' Security Fund reached an "amicable agreement" to divide the funds equally).

Cases granting one party distribution priority over the other depend upon definite proof that specific funds in an account have been traced. *See, e.g., United States v. Doyle,* 486 F.Supp. 1214, 1219 (D.Minn. 1980) (stating that when a securities broker wrongfully commingled his purchasers' funds and bearer bonds without any records for tracing ownership, a broker held the bonds subject to an equitable lien for a pro rata distribution among his customers, apart from one who received priority because he alone was the bona fide purchaser of specified bonds).

Notably, in the few reported cases addressing this issue, courts have not granted priority to clients' security funds over other parties when none of the parties can trace the funds. For example, in a case in which the Clients' Security Fund sought priority in claims to be paid from the general bankruptcy estate of an indicted attorney, the New Jersey Superior Court concluded that no party had priority over the claims of the attorney's general creditors because the commingled funds at issue could not be traced to any of the funds that the attorney may have embezzled from his clients. The court ordered a pro rata distribution of the estate's remaining balance. *Trustees of Clients' Security Fund of the Bar v. Beckmann,* 143 N.J.Super. 548, 555–59, 364 A.2d 15, 19–20 (1976).

One court has also rejected contentions made by the New York Clients' Security Fund that its claims to an escrow fund that had been commingled with limited partnership funds were superior to those of certain investors. *Securities Exch. Comm'n v. Pavarini,* No. 88–4897, 1989 WL 49365 (S.D.N.Y. May 3, 1989) (WESTLAW, DCT database). Dismissing the Clients' Security Fund's request for full reimbursement, the court recommended a pro rata distribution of the funds among eligible clients in line with the *Restatement of Restitution* § 213, which provides:

(1) Except as stated in Subsection (2), where a person wrongfully mingles money of two or more persons, each of them is entitled to share in the mingled fund or in property acquired with the fund, in such proportion as his money bore to the whole amount of the fund.

(2) Where the wrongdoer has effectively separated the money of one of the claimants, that claimant is entitled, and only to, his own money or its product.

*Id.* at 2.

In this case, because the Client Protection Fund and Chicago Title are in comparable positions, we believe the district court erred in concluding that the Client Protection Fund should be favored over Chicago Title. Both are appropriate recipients of the Attorney Trust Account.

## IV.

We will remand for a proper determination of how the Attorney Trust Account should be apportioned and for an evaluation of Chicago Title's proposal of a 65%–35% distribution. We recognize matters of interest and other costs are treated in different ways, depending upon the circumstances. *Compare In re United States Lines, Inc.,* 79 B.R. 542, 547–48 (Bankr.S.D.N.Y.1987) (noting that entitlement to accrued interest could inequitably deplete the proceeds available to all creditors when funds cannot be traced) *with* A. Scott, *The Law of Trusts* § 207 (1988) (reviewing case law that states that when a trustee commits a breach of trust, he is ordinarily liable for interest); *see also Nicholas v. United States,* 384 U.S. 678, 687, 86 S.Ct. 1674, 1681, 16 L.Ed.2d 853 (1966) (recognizing that potential creditors adjust their interest rates "to accommodate their prognosis of the particular debtor's chances of rehabilitation"). We also note that a pro rata distribution of the proceeds is consistent with the case law in this area. However, we leave this in the hands of the district court.

## V. CONCLUSION

We hold that the district court erred in concluding that the Client Protection Fund should be the sole recipient of Goldberg's Attorney Trust Account. Therefore, we will reverse and remand to the district

court for proceedings consistent with this opinion.