IN THE MATTER OF JOSEPH T. ROMANO, AN
ATTORNEY-AT-LAW.

Argued June 5, 1986—Decided November 12, 1986.

*William R. Wood,* Deputy Ethics Counsel, argued the cause
on behalf of the Office of Attorney Ethics.

*Gerald H. Baker* argued the cause on behalf of respondent
(*Baker, Garber, Duffy, & Baker,* attorneys).

PER CURIAM.

This matter arises from a report of the Disciplinary Review
Board (DRB) recommending that respondent, Joseph T. Roma-
no, be disbarred. The matter came before the Board upon a
presentment filed by the District VI Ethics Committee, as a
result of complaints filed by four former clients charging
respondent with misappropriation of clients' funds. Respon-

dent admitted the misappropriations and recognizes that the normal consequence of such conduct is disbarment. *In re Wilson*, 81 *N.J.* 451 (1979). He offers as mitigating circumstances, however, that he was a cocaine addict and that his addiction was a mental or physical disability that caused him to engage in inappropriate behavior.

The DRB summarized the relevant facts as follows:

Respondent had been retained by Sandra Moriggia to represent her in a civil action for injuries she suffered in a motor vehicle accident in 1981. Respondent filed the lawsuit in January 1983 and negotiated a settlement for $55,000, the maximum obtainable under existing insurance policies. Although Mrs. Moriggia had signed a release, she and her family later became unhappy with that amount. Respondent was successful in a motion to declare the release null and void. Soon thereafter he negotiated a settlement for another $15,000 which brought the total to $70,000. Respondent remitted $40,000 to Mrs. Moriggia and retained the balance to cover legal fees, costs and medical expenses.

Respondent, however, did not use the entrusted funds to pay medical expenses. Instead, he used the trust account checks to pay for his drug addiction. He maintained that his drug habit had accelerated over the years to the point where he was over $30,000 in debt to pushers. Respondent claimed he rejected a suggestion by a drug pusher/client that he use clients' money to fund his habit. He did, however, accede to a request that he give these clients' checks to third parties who would endorse and cash them and give respondent credit toward his drug debt.

In July 1984 Mrs. Moriggia notified the district ethics committee that respondent had not paid all of her medical bills as promised. Respondent had retained $11,316 to pay these expenses. After being contacted by the ethics committee, respondent agreed to pay some of the medical bills.

At the ethics committee hearing, respondent generally admitted that he diverted the Moriggia funds. He also admitted similar treatment of $945 which was entrusted to him by a client named McGill, $600 entrusted to him by a client named Sanborg and $277 by a client named Cortez, totalling $1,822. The checks involved in the Moriggia, McGill, Sanborg and Cortez matters were converted during the period of February 1 through March 19, 1984. In mitigation, respondent claimed he was a drug addict. He stated he became involved with controlled dangerous substances in 1978 and his habit increased in use and cost by 1983 to several thousand dollars a week. Respondent produced testimony by an attorney as to his good character and work habits. Dr. George T. Pierson, medical director of a rehabilitation center, testified that respondent underwent in-patient treatment between May 30 and July 11, 1985. While Dr. Pierson believed respondent was aware of what he was doing, he felt the pressures of respondent's drug abuse caused him to divert the client funds.

The district ethics committee found that respondent violated *DR* 1–102 by engaging in illegal conduct that adversely reflected on his fitness to practice

law, that respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation and conduct prejudicial to the administration of justice. The committee concluded that respondent had engaged in a course of 'extreme drug abuse which severely affected his abilities to function as an attorney.' It further concluded that respondent's use of cocaine and alcohol produced a medical condition which resulted in his physical and mental disability at the time of the diversion of the funds. The committee also found that respondent's assertion of mental and physical disability had been established and was causally related to the offense charged. Noting respondent was presently employed by another attorney without access to trust funds, the committee concluded that this procedure offered reasonable safeguards to the public that respondent would not be in a position to misappropriate trust funds again.

Upon a review of the full record, the DRB concluded that there was clear and convincing evidence of respondent's unethical conduct. We have independently reviewed the record and reached the same conclusion.

As the DRB stated in its Decision and Recommendation:

By his own admission, respondent diverted funds belonging to clients. An independent review of the record corroborated this. This case is clearly governed by *In re Wilson*, 81 *N.J.* 451 (1979), which defines misappropriation as

any unauthorized use by the lawyers of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom [*Id.* at 455, n. 1].

The Board finds that respondent knowingly misappropriated client funds, *DR* 9–102. 'The fact that an attorney may not have dirtied his hands with the manual task ... does not necessarily relieve him of culpability....' *In re Berlant*, 458 *Pa.* 439, 328 *A.*2d 471, 474 (1974), *cert. den.* 421 *U.S.* 964, 95 *S.Ct.* 1953, 44 *L.Ed.*2d 451 (1975). Admittedly, respondent did not personally endorse the checks. That respondent divorced himself from the commission of the actual conversions only underscores his moral awareness of his corrupt behavior. *Cf. In re Shaw*, 88 *N.J.* 433, 440 (1982). Indeed, his attempt to distance himself from the wrongdoing does not mitigate but aggravates. Respondent knowingly participated in apparent criminal behavior of forgery and theft.

Respondent offers as a mitigating factor that he was a drug addict. Addiction to controlled dangerous substances has been rejected as a mitigating factor. See *Matter of Stein*, 97 *N.J.* 550, 565–66 (1984). 'Many crimes arise out of drug and alcohol use.' *State v. Roth*, 95 *N.J.* 334, 368 (1984). The Board believes that to allow this to be a mitigating factor to outweigh the seriousness of the crime of attorney theft 'would be a disservice to the bar, the judiciary and the public.' *In re Wilson, supra*, 81 *N.J.* at 456. The Board is mindful of the words of the Court in *Wilson* where it said

... maintenance of public confidence in this Court and in the bar as a whole requires the strictest discipline in misappropriation cases. That confidence is

so important that mitigating factors will rarely override the requirement of disbarment. If public confidence is destroyed, the bench and bar will be crippled institutions [*Id.* at 461].

Respondent was admitted to the bar in 1975 and has no prior disciplinary history. He has cooperated with the ethics proceeding and has expressed remorse. Respondent has undergone rehabilitation and the prognosis for him appears to be good. These mitigating factors, however, are irrelevant in misappropriation cases. *In re Noonan,* [102] *N.J.* [157] (1956) (slip opinion at 4).

Banks do not rehire tellers who 'borrow' depositors' funds. Our professional standards, if anything, should be higher. Lawyers are more than fiduciaries: they are representatives of a profession and officers of this Court [*Wilson, supra* at 458].

In its presentment, the Ethics Committee made no recommendation as to the appropriate penalty. Although a majority of the DRB voted in favor of disbarment, one member favored a lengthy suspension.

In some respects, this case, like those involving alcoholism or gambling, is a modern American tragedy. Respondent was once a promising young trial attorney. He is now a recovering drug addict. His testimony recites his gradual surrender to the use of cocaine. According to respondent, sometime in 1978 he was introduced by friends to cocaine at a bar in New York. Six to eight months later, he began buying a grain of cocaine each weekend. His drug use increased to an eighth of an ounce a weekend, then in 1979–80 to a quarter of an ounce a week. By 1980–81, he was using as much as a half an ounce a week. After 1981, he started "freebasing" (smoking cocaine), which led to his using an ounce a week, at a weekly cost of $1,800 to $2,100. He developed a line of credit of $10,000 with each of three drug dealers, and in 1982 he was indebted to them for over $30,000. Although his increased drug use and related lifestyle frequently left him exhausted, at all times he was able to function successfully as a trial lawyer. He settled some cases and tried others. According to respondent, no client was ever dissatisfied or complained about his services. No client, lawyer, or judge suspected respondent's drug addiction.

On July 30, 1984, however, Mrs. Moriggia complained to the District VI Ethics Committee because respondent had not paid

certain of her medical bills, as he had promised to do, from the proceeds of the settlement of her personal injuries action. That complaint led to an audit of the trust account of Jesse Moskowitz, the attorney with whom respondent was associated, and ultimately to the issuance on February 12, 1985, of the complaint by the Ethics Committee.

Respondent accomplished the diversion of client funds through three methods: (1) On respondent's instructions, trust checks totaling $6,665.85 in the Moriggia and McGill matters were drawn by Mr. Moskowitz or his secretary to legitimate payees; respondent, however, delivered the checks to a drug dealer in part-payment for cocaine purchases. (2) On respondent's instructions, trust checks totaling $5,334.85 drawn by Mr. Moskowitz or his secretary were made payable to respondent as payee. Those checks, however, were duplicates of payments previously made to respondent, who used the funds to purchase cocaine or to pay drug dealers on account of prior purchases. (3) Respondent forged Mr. Moskowitz's name as maker to checks made payable either to respondent or to Mr. Moskowitz, whose endorsement respondent also forged. Respondent then used these checks to pay drug dealers for cocaine purchases.

The Ethics Committee accepted the testimony of one of respondent's witnesses, Dr. George T. Pierson, who testified that respondent's diversion of client funds was the result of physical or mental disability caused by his drug addiction. He described respondent's behavior as "inappropriate" and stated that "the diversion of funds was the direct result of his disease." Nothing in the record indicates, however, that respondent did not comprehend that he was misappropriating clients' funds or that he did not know or appreciate that the misappropriations were wrongful. Indeed, the evidence is clear and convincing that respondent knew that he was diverting client funds and that it was wrong. For example, when a drug dealer to whom he was indebted came to respondent's home and saw clients' checks, respondent explained that he could not give the

dealer the clients' money. Nonetheless, respondent gave the dealer the checks to pay for his drug debts. We have no doubt that respondent knew exactly what he was doing when he forged his employer's signature on two checks and when he delivered other checks to a drug dealer for credit against his outstanding bill. We conclude that respondent has failed to demonstrate that a disease of the mind rendered him unable to tell right from wrong or to understand the nature and quality of his acts. The picture that emerges is one of a lawyer who could function successfully as a practitioner, who knew that it was wrong to misappropriate clients' funds to pay for his own drug debts, but who proceeded to use clients' funds to pay for his own drug addiction.

To respondent's credit, he is participating in a drug rehabilitation program and appears to be a recovering drug addict. The tragic fact remains, as the DRB found, that respondent is "an admitted thief." We conclude that the only appropriate sanction is disbarment. *See In re Hein*, 104 *N.J.* 297 (1986).

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs.

*For disbarment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

## ORDER

It is ORDERED that JOSEPH T. ROMANO of JERSEY CITY, who was admitted to the bar of this State in 1975, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that JOSEPH T. ROMANO be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.