## IN THE MATTER OF ARTHUR J. LOBBE, AN ATTORNEY AT LAW.

Argued January 4, 1988—Decided March 25, 1988.

*William R. Wood,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*William F. Maderer* argued the cause for respondent (*Saiber, Schlesinger, Satz & Goldstein,* attorneys).

PER CURIAM.

Once again, we must address the difficult problem of evaluating the mitigating effect of compulsive behavior on an attorney's admitted misappropriation of clients' funds. This matter arises from a report of the Disciplinary Review Board (DRB) recommending disbarment of respondent for the misappropriation. Respondent argues that at the time of the misappropriation, he was caught in the grips of the "disease" of compulsive gambling, an "impulse disorder" which causes the victim to lose control over his behavior and strips him of the ability to appreciate or understand the full consequence of his acts, thus

demonstrating that he did not "knowingly" misappropriate clients' funds, an event that almost invariably results in disbarment under the rule of *In re Wilson*, 81 *N.J.* 451 (1979).

Procedurally, this case arose in two phases. Following the DRB's 1983 recommendation that respondent be disbarred for misappropriation of trust funds, we remanded the matter to the District Ethics Committee (DEC) for a supplemental hearing on Lobbe's compulsive gambling defense. At this 1986 hearing, conflicting expert testimony was offered. Lobbe's expert, Dr. Sirgay Sanger, a Board-certified psychiatrist who had been treating respondent since 1983, testified that compulsive gambling is an "impulse disorder" so powerful that an affected individual is no longer able to maintain a normal life pattern and that although, on a superficial level, Lobbe may have recognized that taking clients' money was wrong, he was unable to refrain from what his unconscious was forcing him to do.

The OAE's expert witness, Dr. David J. Flicker, also a Board-certified psychiatrist, agreed that Lobbe was a pathological gambler but testified that the psychiatric profession does not recognize compulsive gambling as a mental disorder that can render a person unable to conform his conduct to legally acceptable standards. The DRB summarized his views:

> He opined that respondent had the ability to understand it was wrong to take clients' funds and to conform his conduct to legal and ethical standards. He knew the nature and quality of his acts. In all areas except gambling, * * * respondent did not have diminished mental ability. * * * [R]espondent simply viewed the taking of money as borrowing and in that sense, had no intent to do anything wrong. Had it not been for gambling, respondent probably would not have taken funds in the first instance. Nonetheless, * * * respondent knew his behavior was wrong and against the rules of professional ethics.

In sum, Dr. Flicker concluded that Lobbe had both the ability to understand that misappropriating clients' funds was wrong and the ability to conform his conduct to legal and ethical standards.

The DRB found that although pathological gambling has been medically recognized as an impulse control disorder, this

recognition does not mitigate a gambler's culpability for misappropriation. The DRB also concluded that Lobbe's disorder did not result in a " 'loss of competency, comprehension, or will * * * of such magnitude that it would excuse or mitigate conduct that was otherwise knowing and purposeful.' " (quoting *In re Hein*, 104 *N.J.* 297, 302 (1986)). The Chairman of the DRB based a concurring recommendation of disbarment on Lobbe's admitted misappropriation of $5,000 to aid his needy parents. He would otherwise have regarded the compulsive gambling as a mitigating factor warranting an indefinite suspension until we could be assured Lobbe's mental illness was arrested. Another member of the DRB dissented. He would have imposed a lengthy suspension but believed that the recognized disease of compulsive gambling warranted relief from the *Wilson* sanction. In his view, "[a] balance must be struck" between maintaining public confidence in the bar and the bar's maintaining respect for the ethics system's ability to decide each case "on its own merits."

Initially, we note that, like the DEC and the DRB, we are clearly convinced that Lobbe misused clients' funds. Even while in law school in the early 1970s, respondent gambled heavily, but thereafter brought his problem under control. However, in 1981, respondent's compulsive gambling escalated to overwhelming propensities. Ironically, it was a 1981 visit to Atlantic City on legal business that helped to trigger respondent's relapse. This exposure to State-sponsored gambling coincided with respondent's assumption of sole control of the finances of his law practice. Prior to that, he had practiced in partnership with an attorney who had joint, or at least close, supervision of their shared trust account.

Respondent, his secretary, and his wife related his swift decline. In early 1981, he began betting on professional and college basketball games every night; he did not really have any daily schedule for his law practice. If he had to make appearances, he would do so, but otherwise gambling was his life. Respondent's personal friendships changed; gamblers

frequented his law office. He admitted that there were cases—"at least one case, in particular, that I know I just demolished." He had to be near a radio at quarter to and quarter after the hours so that he could follow the sports results. So obsessive was his preoccupation with gambling that even when his father became terminally ill (losing a leg to diabetes), respondent failed to accompany his wife on a flight to Florida to visit his father.

With frankness and sadness his secretary recounted how, during this time, respondent went from a well-dressed, capable attorney to a slovenly person who attended the office only rarely. He had worked on an even keel until 1981 when he became obsessed with horse racing and gambling. She recalled:

> As soon as Art would come [into the office], he would see the checks on a settlement. He would say, "Oh, [a]ll right. Great. I have money," and it would go in his pocket and I would never see it again. The checks I would get would go into the trust account, be deposited, and between the clearing time, Arthur might have taken it out.

Only rarely were checks deposited in the regular course of business and disbursed to clients. When the secretary brought these irregularities to respondent's attention, his reply was always the same:

> "I'll take care of it. Don't worry about it." When people called, and I had the settlement, they would say, "You told me it came in. Why am I not getting money?"
>
> Art would talk to them on the phone and say, "Oh, it takes ten days for it to be processed. * * * We'll get you your money." [A]nd he always had a way of calming people down. Arthur would end up getting the money to them.

The sale of a business known as Starlite Auto Sales, Inc. resulted in an ethical complaint that brought his conduct to the attention of the bar. In July 1981, respondent was given a $21,000 deposit to hold for the satisfaction of a lien held by Nicholas and Ann Schiavello. At the closing in October, he was unable to produce the money. He gave the Schiavellos a check but asked that they not deposit it until November. When a

later check for $13,000 [1] was returned for insufficient funds, an audit performed on his trust account revealed that he had withdrawn the $21,000 from his trust account almost as soon as he had received it. During the last half of 1981 over $52,000 was drawn on respondent's trust account, payable to either his law office or to respondent personally. The DEC concluded that respondent had misappropriated $21,000 for his personal purposes that was to have been held in trust by him for the Schiavellos and that he had failed to keep appropriate trust account records.

Respondent candidly admitted that after depositing the $21,-000 check on July 22, 1981, he depleted his trust account to the point where it had only some $200 in it at the end of that month. He did not dispute the impropriety of his conduct, acknowledging that between May and December of 1981 he had been using clients' funds:

Q. Is there any explanation you can give or desire to give to this Committee as to the drawing of checks from that account that caused the overdraft?

A. Well, it was wrong. I don't know if any explanation is good. I don't think there is any reasonable explanation other than that I felt a problem with my parents. I never meant to deprive anybody of any money.

I had the interest of my clients at heart and I made sure that they were always paid. I never wanted to deprive any clients of any money. There was just circumstances there that—.

\* \* \* \* \* \* \* \*

Q. So when you say that you intended not to misuse their money, are you saying that you intended to pay them back?

A. Yes.

It was, in his words, a "Peter to Paul situation."

In a recent series of cases, we have examined the effects of alcohol, *In re Hein*, 104 *N.J.* 297 (1986); drugs, *In re Romano*, 104 *N.J.* 306 (1986); sickness, *In re Skevin*, 104 *N.J.* 476 (1986), *cert. denied*, —— *U.S.* ——, 107 *S.Ct.* 1954, 95 *L.Ed.*2d 526 (1987); and compulsive gambling, *In re Goldberg*, 109 *N.J.* 163

---

[1]Respondent's notation on this item was "Balance—$8,000—held by agreement," an agreement his clients acknowledged.

(1988), as factors that might possibly mitigate the almost invariable sanction of disbarment resulting from the knowing misuse of clients' funds. In *In re Goldberg, supra,* 109 *N.J.* at 172, we recognized the growing evidence that compulsive gambling is a disorder that has been classified as mental illness by the American Psychiatric Association. We concluded, however, that the evidence in that case did not demonstrate a loss of competency, comprehension, or will, such that otherwise knowing and purposeful conduct would be excused or mitigated. We also held that there was no evidence that respondent's compulsion to gamble created an uncontrollable urge to misappropriate his clients' funds. *Id.* at 171–172. We said in *Goldberg* that there is a difference between a "compulsion to gamble [and] an uncontrollable urge to misappropriate * * * clients' funds." 109 *N.J.* at 171.

In this case, Dr. Sanger testified, and we agree, that compulsive gambling is undoubtedly a "but for" cause of the misappropriation. "They go into it because they need the money for the wagering. * * * [U]nlike the antisocial [criminal], the gambler, at least superficially, * * * says to himself that he is borrowing the money. * * * [H]e will give it back."

Respondent understood his situation. He candidly stated that when he took his clients' funds, he knew that he was doing something wrong. "[I]f someone would have asked me, would have stopped and taken time and said, 'Do you know what you're doing is wrong,' I would have said, 'Yes, I know what I was doing was wrong.' I never thought about it."

In sum, as respondent candidly admitted to the Chairman of the DEC, his testimony was to the effect that he had a "compulsive urge to gamble." As Dr. Sanger put it, "it is an impulse disorder that has taken control" of his personality.

Respondent's expert testified that compulsive gamblers know "in a very glib, shallow way [that they misappropriate clients' funds] but they don't really know. [I]f they really, truly knew the consequences and comprehended the larger overall meaning

of what they were doing, they wouldn't do it." As he put it, an attorney who is told that his accounts are short or they are missing checks simply " 'yeses them' * * * but he doesn't really do anything. He's just saying, 'leave me alone. I'm not interested in any of that. I want to get to my bookie or I want to get to the track or I want to get to the casino. That [the status of his accounts] is irrelevant to me.' " Thus, the family and friends of compulsive gamblers are frustrated because they see the disaster waiting to happen, yet they are powerless to influence the behavior.

At this point law and psychiatry diverge in their treatment of mental status, a divergence that Dr. Sanger characterized as the difference between "the superficial and the profound." For the most part, the law deals with the conscious, not the unconscious, components of human behavior. Whether these aspects are superficial or profound we leave to others.

We note, as we did in *Hein*, that these psychological states are extremely difficult to understand. This series of cases has, however, demonstrated a remarkable similarity in the effect of an impulse disorder on the personality of an afflicted attorney. Like Hein, respondent recognized that he was dealing with clients' money, but it was simply a not-caring attitude that led to the use of the funds. The attorney who compulsively gambles may appear to be able to function as a lawyer, but may in fact be concealing this dysfunction behind what Dr. Sanger described as the "mask of sanity." As we have noted in *Hein*, *Romano*, and *Skevin*, *supra*, a similar effect on character and perception may be caused by financial reverses and hardship in the family. We suspect, though, that an attorney who misuses clients' funds to shield his family from shame or to educate his children suffers from a somewhat more justifiable impulse.

And although the effects of each disorder on the attorney's personality are similar, gambling and drug dependency seem to be the most threatening of the disorders because of the escalating sums of money that are required to satisfy the compulsion. The attorney's ready access to funds poses a special danger for

clients. As Dr. Sanger said, "[p]lenty of doctors are at the track and [in] casinos gambling more than they should, but they don't get into legal difficulties, because they just don't have funds in trust or in escrow * * *." In this case it is not without significance that respondent's gambling escalated in proportion to his access to clients' funds. We say this not to demean him because, as we have noted, he has made no pretext of what he did, nor has he attributed his problems to bad bookkeeping or to an inattentive secretary. Rather, he has undertaken to address his personal problems, which he recognizes as the cause of his present difficulties.

Respondent has made an excellent effort to overcome his affliction. He has been faithful in his adherence to a program of rehabilitation. He has matched that commitment with a dedicated work effort, serving in the public sector in the field of parole. The regrettable truth, in this and in other areas of compulsion, is that it is sometimes the experience of "rock bottom" that sparks the long uphill climb to the extraordinary acts of self-control that overcome the affliction. All seem to agree that the first step back begins with the alcoholic, the drug dependent, or, as here, the compulsive gambler. As we have said in *In re Hein*, 104 *N.J.* 297, 303 (1986), "[w]e wish that we knew more." What we do know leads us to conclude that dependent attorneys retain an area of volition sufficient that we cannot distinguish these attorneys from those who yield to the equally human impulse to avert shame, loss of respect, or family suffering.

After considering all of the circumstances, we conclude that the appropriate discipline is disbarment. We direct further that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.

*For disbarment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

## ORDER

It is ORDERED that ARTHUR J. LOBBE of BAYONNE, who was admitted to the bar of this State in 1976, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that ARTHUR J. LOBBE be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.