IN THE MATTER OF LOUIS J. NITTI, AN ATTORNEY-AT-LAW.

Argued January 23, 1986—Decided May 27, 1988.

*William R. Wood,* Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Stephen D. Cuyler* argued the cause for respondent (*Stryker, Tams & Dill,* attorneys).

PER CURIAM.

In *In re Goldberg,* 109 *N.J.* 163 (1988), we ordered the disbarment of a compulsive gambler who had knowingly misappropriated client monies to fund his habit. In rejecting respondent Goldberg's contention that his compulsion should serve to mitigate the discipline to be imposed, we found that the record did not "reflect an impairment of respondent's will sufficient to excuse or mitigate the knowing misappropriation of clients' funds." *Id.* at 172. We there declared that

> [o]ur understanding of the compulsive behavior that led to these misappropriations cannot result in "lowering the barriers to the protection we have attempted to give to that portion of the public who are clients, especially clients who entrust their money to lawyers."
>
> [*Ibid.* (quoting) *In re Hein,* 104 *N.J.* 297, 304 (1986).]

Likewise, in *In re Lobbe*, 110 *N.J.* 59 (1988), we addressed the difficult problem of the mitigating effect of compulsive gambling on an attorney's admitted misappropriation of clients' funds. *Ibid.* Repeating our wistful longing for greater insight into the riddle of compulsive behavior ("We wish that we knew more." *In re Hein, supra,* 104 *N.J.* at 303), we concluded that

> dependent attorneys retain an area of volition sufficient that we cannot distinguish these attorneys from those who yield to the equally human impulse to avert shame, loss of respect, or family suffering.
> [*Id.* 110 *N.J.* at 66.]

Our opinions in *Goldberg* and *Lobbe* pave the way for our decision in this disciplinary proceeding in which we conclude, consistent with the recommendation of the majority of the Disciplinary Review Board (DRB), that respondent, a compulsive gambler who misappropriated clients' funds, must be disbarred.

I

The appeal comes to us on a stipulation of facts. Through that stipulation respondent, Louis Nitti, acknowledges that during 1980 and 1981 he drew gambling markers against his law firm's trust account to cover advances made to him by the Boardwalk Regency Casino in Atlantic City. This pledging of the firm's trust account served to establish a credit line that entitled respondent to borrow gambling funds for a period of up to one month on presentation of a marker, which functioned as a promissory note or check. If the markers were not repaid on time, the casino was authorized to present them for payment to the banks listed on respondent's credit application.

The details of respondent's method of operation appear in a report of an audit of the trust account conducted by a certified public accountant engaged by respondent's firm after ethics charges had been filed. It was Nitti's usual practice, particularly with personal injury cases, to make distributions of the proceeds to the clients on disposition of the matter. At times, however, he would withhold distribution to the firm of the fees

and reimbursed costs, accumulate the fees and reimbursed costs, and make distribution of fees and costs at one time covering several matters. The account cards would be duly marked to reflect a disbursement to the client, and generally to reflect the later distribution of the fee and reimbursed costs. As a result of this practice, the trustee account often contained sums that belonged to the firm. In addition, in several instances, Nitti made deposits to the trustee account of his personal funds to "catch up" to his unauthorized disbursements. Notwithstanding respondent's unauthorized disbursements from the trustee account, the balance of the funds on deposit at the end of each month (with certain exceptions) exceeded the funds properly in trust. Consequently, the auditors found no evidence of any instance in which a check drawn from the trustee account was returned for insufficient funds.

The exceptions to which the report refers were based on the auditor's examination of the month-end balances for January 1980 through August 1982. The trustee account was found to be in balance at the end of each month, with the following exceptions:

| Date | Trust Account Balance | Sums Due Clients |
| --- | --- | --- |
| 4/81 | $ 292.14 | $ 8,920.88 |
| 12/31/81 | $ 1,981.62 | $14,747.84 |
| 3/31/82 | $ 4,966.92 | $ 5,503.20 |
| 6/30/82 | $11,172.02 | $17,544.75 |
| 7/5/82 | $ 7,805.22 | $17,782.32 |

Because respondent had pledged the firm's trust account as security for obtaining a line of credit at the casino, the auditors reviewed the firm's 1979 records to determine if there were any disbursements from the trust account for casino counterchecks. There were none. In 1981 there were ten disbursements from the trust account totalling $14,000, of which $12,000 was verified as disbursements to the casino. Respondent made five deposits during this period for a total of $9,000. In addition to

this, there were five other casino counterchecks presented against the account, each for $1,000, which were immediately stopped by respondent. According to the records of the casino, respondent used his line of credit 161 times between January 1980 and May 1982 to borrow a total of $164,000.

Respondent acknowledges, in the stipulation of facts, that the procedure described above constituted a use of client money for his benefit, and that that use of the funds was without the knowledge or authorization of his clients or his law partner.

In addition, respondent admits that he intercepted checks intended for the firm's trust account, endorsed them, and used the proceeds for his personal benefit, again all without the knowledge or authorization of the clients or of his law partner. In one instance Nitti drew a $6,000 trust check to a client, forged the client's endorsement, and diverted the funds to his own use, without knowledge or authorization of client or partner. In no instance did any client experience a loss of funds.

The juggling necessary to sustain the foregoing funding scheme was made possible by the fact that Nitti was responsible for the firm's financial record-keeping, including the business and trust accounts. His mishandling of the trust fund avoided detection because although the firm's accountant conducted an audit of the business account, he did not review the trust account.

II

Respondent acknowledges his knowing misappropriation of trust funds. His argument is not that he should not be disciplined, but rather that his "compulsive" condition should serve to mitigate the discipline to something less severe than disbarment. In support of his position respondent produced the testimony of his treating psychiatrist, Dr. Robert T. Latimer, who confirmed that the Diagnostic Manual of the American Psychiatric Association now lists compulsive gambling—the condition for which he was treating Nitti—as a separate diag-

nostic category. Dr. Latimer acknowledged that a compulsive gambler has the ability to distinguish right from wrong and to understand the character and quality of his acts, but added that

> [w]hat happens is that you cannot compare the ability of a person under that type of duress to the ability that you and I might have in our daily lives. These are people who know they are doing something wrong but simply cannot control it because of the anxiety which is so intense, the need for this anesthetic of gambling is so strong that a person will drive 125 miles an hour down the Parkway to get there, he realizes he's going to get a ticket for speeding, he cannot stop it. (Footnote omitted).

According to Dr. Latimer the compulsive gambler does not intend to steal but only to borrow and then return the funds. The current state of psychiatric knowledge recognizes that there is no cure for compulsive gambling but that, like alcoholism and drug addiction, the condition can be arrested or neutralized. Dr. Latimer saw Nitti as being in a successful state of arrest. He believed respondent's prognosis to be excellent. In addition, we have been made aware of circumstances in respondent's personal and family background that would test anyone's endurance. Moreover, the series of events recounted above represent Nitti's only brush with the ethics authorities in twenty-six years of practice.

But at bottom the problem here remains as it was in *Goldberg* and *Lobbe* (see *supra* at 321–322): a lawyer who misappropriates clients' funds knowing that that conduct is wrong breaches a public and professional trust that cannot be repaired by discipline less than disbarment. *In re Wilson*, 81 *N.J.* 451 (1979).

We continue to recognize, as we did in *Goldberg*, that "there may be circumstances in which an attorney's loss of competency, comprehension, or will may be of such a magnitude that it would excuse or mitigate conduct that was otherwise knowing and purposeful." *Goldberg, supra,* 109 *N.J.* at 168 (citing *In re Jacob*, 95 *N.J.* 132, 137 (1984)). This is not such a case, any more than was *Goldberg* or *Lobbe*. As the Office of Attorney Ethics points out in its brief, .

[w]ith respect to the casino markers respondent kept pace by depositing his own funds to the trust account within a few days. When the markers got ahead of him in April 1981, he stopped payment on them and repaid the casino in regular monthly installments. An examination of [the casino] credit record (Exhibit C-2) shows that respondent kept his open balance well under control by frequent payments of cash or chips. Most significantly, when respondent perceived a problem with the casino markers in April 1981, he ceased all credit activities.

The point, well taken, is that serious as respondent's condition is, it by no means rendered him incapable of controlling his conduct.

Based on the foregoing, we agree with the conclusion of the majority of the DRB that any discipline less than disbarment would depreciate the seriousness of respondent's acts of misconduct. Respondent is therefore disbarred. He is directed to reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

## ORDER

It is ORDERED that LOUIS J. NITTI of LIVINGSTON, who was admitted to the bar of this State in 1956, be disbarred, effective immediately; and it is further

ORDERED that LOUIS J. NITTI reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that LOUIS J. NITTI be permanently restrained and enjoined from practicing law; and it is further

ORDERED that LOUIS J. NITTI comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with disbarred attorneys.

*For disbarment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.