IN THE MATTER OF RICHARD M. STEINHOFF, AN ATTORNEY AT LAW.

Argued January 30, 1989—Decided March 17, 1989.

*William R. Wood,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Patrick T. Collins* argued the cause for respondent (*Dunn, Pashman, Sponzilli, Swick & Finnerty,* attorneys.

PER CURIAM.

Once again, we confront the devastating effect of drugs on a young life. Lawyers, no less than athletes and other members of society, are at risk. Respondent's attorney described his case as a "modern American tragedy." A brilliant, hard-working, young attorney, so able that he served as a court official while still a law student, has fallen victim to the use of cocaine. Admitted to the bar in 1981, he practiced first as Public Rate Counsel in the Public Advocate's Office and thereafter opened his own office in association with another young attorney in late 1982. His associate and secretary described the progressive deterioration of his work habits as he became more dependent on drugs. It affected all aspects of his practice: the way he dressed, the way he handled his cases, the way he handled his clients (one threatened to kill him for his neglect), and, more importantly, the way he handled his trust account.

It is this last aspect that is the primary focus of our ethical inquiry. Respondent does not dispute that in the midst of his decline unauthorized withdrawals were made from his clients' trust fund for his own benefit. He contends, however, that at the time of the misappropriation he was caught in the grip of a drug dependency that caused him to lose control over his behavior and stripped him of the ability to appreciate or understand the full consequence of his acts. According to Steinhoff, this dependency demonstrated that he did not "knowingly" misappropriate clients' funds, an event that almost invariably results in disbarment under *In re Wilson*, 81 *N.J.* 451, 453 (1979).

The case arises from a conflict between the recommendations of a Special Master and the Disciplinary Review Board (DRB). The report of the Special Master recommended a discipline less severe than disbarment. In the view of the Special Master, this case exemplified the rare case that would not require disbarment under *Wilson, supra*, 81 *N.J.* at 461. The DRB disagreed with the Special Master's report and recommended disbarment of the respondent for the misappropriation.

The critical allegations of the complaint involve several instances of misuse of clients' funds in the spring of 1983. On April 29, 1983, respondent received a $7300 attorney's check as a deposit on a real-estate closing to be held in trust until the closing. Instead of depositing the $7300 in his trust account, respondent deposited $6800 and took $500 in cash. He used this to cover shortages in his business account. In May 1983, respondent received a $5,000 deposit on another closing from which he later drew an unauthorized $2800 check to "cash," thus invading either or both of the two trust balances in his account. There were other instances of "cash" withdrawals from his trust account when respondent delayed in clearing the trust receipts to cover the necessary disbursements of the closing.

To his credit, respondent does not deny what the records disclose. He says, however, that "I didn't steal any money in my own mind." And with respect to the $2800 withdrawal he claims, "I have no independent recollection as to the actual occurrence of that item rather than my position that I did not—I don't believe myself capable of theft."

It cannot be doubted that respondent's judgment was impaired by cocaine. Anyone who doubts the effect of cocaine on the health and well-being of the young person need only to read this record. At first attracted to the drug by its promise of heightening his mental prowess while he was working the long hours of a young Rate Counsel, respondent soon became pathetically dependent. His respiratory tract became so severely damaged by the ingestion of the drug that he bled from its use. Had he not checked himself into a detoxification program in early 1984, he is certain that he would have died.

But this was the end and not the beginning. For our purposes we are concerned with his competency, particularly in April and June of 1983 when he withdrew his clients' funds. The question is whether he suffered such a loss of competency, comprehension, or will of such magnitude as would excuse conduct that was otherwise knowing or purposeful. *In re Jacob*, 95 *N.J.* 132, 137 (1984).

Hence, the hearing before the Special Master focused on the respondent's mental state in the spring of 1983. Concededly, by the time of a September 1983 closing, respondent's conduct was bizarre if not irrational. At that date, respondent represented clients in a transaction where the proceeds from the sale of one property was being used to purchase another property. Although the purchase of the second property required additional funds of $10,000 to close, rather than collect funds from his clients, respondent disbursed to them an extra $5,000. In other ways his partner described irrational conduct on his part. He said:

> By the end of the summer I couldn't even talk to him.   *  *  * [H]e became more and more distant and more erratic. And I would—I would read some letters that he was doing, and it made no sense to me. And in conversations with people, and just the way he was, he was practicing to me, to me it wasn't based on logic or reason.

Nevertheless, we are unable to conclude that respondent's earlier conduct was so trance-like. As he put it himself, "I wasn't always out to lunch."

Much attention at the hearing before the Special Master in this case was devoted to the question of whether respondent was psychotic or out of touch with reality. "In evaluating the quality of an attorney's misconduct, we have not sought to draw fine lines between the losses of volitional or rational powers or higher forms of consciousness." *In re Crowley*, 105 *N.J.* 89, 92 (1987). Instead, we have attempted to determine if circumstances exist that would justify us in concluding that the attorney had suffered such a loss of comprehension that "he was unable to comprehend the nature of his act or lacked the capacity to form the requisite intent." *In re Hein*, 104 *N.J.* 297, 303 (1986).

Respondent's decline in judgment is tragically similar to that of other dependent attorneys with whose lives we have become familiar. Respondent's addiction was like that in *In re Hein* in which the attorney's expert described the progression of dependency as reaching the point where there was "a disruption eventually of the normal critical thinking and in concern and judgment in his perception of daily living and in the accomplishment of skills in his particular profession." *Id.* at 303.

Respondent may also be compared with the compulsive gambler in *In re Lobbe*, 110 *N.J.* 59 (1988). These attorneys know in a shallow way that they misuse clients' funds, "but they don't really know. [I]f they really, truly knew the consequences and comprehended the larger overall meaning of what they were doing, they wouldn't do it." *Id.* at 64–65. It is like a disaster waiting to happen, but friends, family and associates are powerless to influence the behavior.

Here, as in *Hein* and *Lobbe,* the evidence falls short of establishing that respondent did not know what he was doing. Similar to the attorney in *In re Crowley, supra,* 105 *N.J.* at 93, who said that he used the money because "I had no income or substantial income," respondent's misuse of clients' funds can be traced to that period of time when he began to experience a shortage in his firm's accounts. By his secretary's account, it was not until the summer of 1983 that he lost the ability to comprehend the nature and consequences of his actions: "Up until then, he wasn't too bad." For her, an experienced legal secretary, a client's complaints were to be expected—"I didn't find that unusual."

We sense, as the Master did, that like the attorney in *In re Romano,* 104 *N.J.* 306 (1986), respondent "primarily used [the money] to purchase the cocaine required by respondent's addiction which overcame his otherwise moral instincts." In the Special Master's view, the psychiatric evidence revealed that respondent had a "personality disorder with drug abuse," but "it was not serious enough to have prevented him from knowing that he was using clients' money or that such use was wrong." The consciousness of depositing $6800 in one's trust account and taking $500 in cash from a $7300 deposit is hard to question. Hence, the Master found that respondent "had the minimal judgment and comprehension to know that he was utilizing trust monies for his personal needs."

In a series of recent cases, *In re Lobbe, supra,* 110 *N.J.* 59; *In re Crowley, supra,* 105 *N.J.* 89; *In re Romano,* 104 *N.J.* 306 (1986); *In re Hein, supra,* 104 *N.J.* 297, we have found it necessary to disbar attorneys of previously good record whose compulsive conduct, whether due to dependence on drugs, alcohol, or gambling, had contributed to or caused the loss of judgment that led to the misappropriation of clients' funds. We have struggled to resolve the dilemma of recognizing these personality disorders as the diseases that they are, while acknowledging the devastating effect that misappropriation has on public confidence in the bar and the court.

But we have been unable to rationalize the qualitative differences that would excuse the violation in the case of one suffering disease or defeat, or one suffering from drugs or other dependency from one suffering the anguish of collapsing home life or marriage due to economic or other strains.

Consequently, we have chosen to resolve the choice of professional discipline by maintaining our primary focus on the public interest.

[*In re Skevin,* 104 *N.J.* 476, 489 (1986), *cert. denied,* 481 *U.S.* 1028, 107 *S.Ct.* 1954, 95 *L.Ed.*2d 526 (1987).]

Respondent has made an excellent effort to overcome his affliction. He has been faithful in his adherence to a program of rehabilitation. Like others, he seemed to commence this long, uphill climb after the experience of rock bottom.

Nevertheless, based on our independent review of the record, we are clearly convinced that respondent engaged in the proscribed conduct and that the appropriate discipline is disbarment. We direct further that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.

*For disbarment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

It is ORDERED that RICHARD M. STEINHOFF of SOUTH ORANGE, who was admitted to the bar of this State in 1981, be disbarred; and it is further

ORDERED that RICHARD M. STEINHOFF reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that RICHARD M. STEINHOFF be permanently restrained and enjoined from practicing law; and it is further

ORDERED that RICHARD M. STEINHOFF comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with disbarred attorneys.