577 A.2d 158

IN THE MATTER OF DALE W. BAKER, AN
ATTORNEY AT LAW.

Argued January 29, 1990—Decided August 3, 1990.

*Richard J. Engelhardt,* Assistant Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*John J. Pribish,* argued the cause for respondent.

PER CURIAM.

This matter arises from a report of the Disciplinary Review Board (DRB) recommending that respondent, Dale W. Baker, be disbarred. The matter came before the DRB on a presentment filed by the District VIII Ethics Committee (DEC), as a result of a complaint filed by two former clients charging respondent with misappropriation of their funds. Respondent admits the misappropriations and recognizes that the normal

consequence of such conduct is disbarment. See *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979). He claims, however, that his conduct was occasioned by a loss of will of sufficient magnitude to excuse his otherwise admitted misappropriation, thereby making disbarment inappropriate. Our independent review of the record leads us to conclude that respondent failed to demonstrate that he suffered a loss of will sufficient to excuse his egregious conduct. We conclude that disbarment is the appropriate discipline.

I

Respondent was admitted to the bar in 1980. He was an associate in a law firm until April 1984, when he opened his own office in New Brunswick. In 1983 he began to represent his wife's parents, the Clementses, who were experiencing severe financial problems. In 1984 to avoid the foreclosure of their home, respondent arranged with the Clementses' mortgagee that the mortgage payments of approximately $880 per month would be paid to respondent, who in turn would forward his check to the mortgagee. At the time of the arrangement respondent knew that his in-laws would be unable to make the full monthly payment of $880 and anticipated that he would have to pay the $150 expected shortfall.

Between August 1984 until January 1986, respondent's in-laws failed to make eight to ten mortgage payments. Even though respondent did not have sufficient personal funds in his trust account, he nevertheless made the payments to the Clementses' mortgagee, invading other clients' funds then on deposit.

As set forth by the DRB in its Decision and Recommendation, respondent also invaded his trust account for other uses:

> Shortly after respondent began to use trust funds to pay his in-laws' mortgage, he invaded the account for other uses. He paid approximately $1200 for the partial tuition costs for one of his wife's brothers. He purchased a fur coat for his wife in October, 1984 using $1400 in trust account funds. He also used client trust funds to purchase a $2300 emerald ring for his wife.

Beginning in October 1984, and continuing to November 27, 1985, respondent wrote a series of fourteen additional checks, drawn to and endorsed by himself. The amount of each check varied, from a low of $325 to a high of $4500. None of these trust account checks bore any case reference or other explanation. These fourteen checks, admitted into evidence as Exhibit J–2, totalled $24,025.

Respondent's misappropriations remained undiscovered until the former clients, Kathleen and Arthur Mangino, filed an ethics grievance against him. The Manginos had hired respondent to refinance their mortgage. At the closing held on October 29, 1985, respondent was to pay off I.R.H.T. Mortgage Company (I.R.H.T.), the original mortgagee, with the proceeds from the newly-recast mortgage. When the Manginos first were advised by I.R.H.T. that the mortgage had not been paid, they immediately called respondent. He advised them he would look into the matter but stated that he believed the mortgage payoff check had crossed in the mail with the late-payment notice. On being told by Mrs. Mangino of the receipt of a second late notice from I.R.H.T., respondent implied to Mrs. Mangino that he had taken care of the problem. On December 14, 1985, Mrs. Mangino was shocked to receive a notice that the mortgage was in default and that foreclosure proceedings were to begin. Respondent again assured Mrs. Mangino that he had taken care of everything. She, however, called I.R.H.T. who informed her that it had received neither the mortgage payment or any correspondence from respondent. She promptly filed an ethics grievance. Thereafter, respondent did pay off the I.R. H.T. mortgage.

The Mangino ethics complaint triggered an audit of respondent's books and records by an accountant retained by the Office of Attorney Ethics (OAE). The accountant concluded that as of January 1986 respondent's trust account was out of trust by $47,693.59, approximately $12,000 of which was attributable to the mortgage payments respondent had made for his in-laws. The remainder of the deficiency was attributed to payment of respondent's "personal expenses."

At the DEC hearing, respondent's accountants stated that he had reduced the $47,693.59 shortage in his trust account to $40,856.22 by May 31, 1986, but that the shortage had increased to $44,533.04 as of June 30, 1986.

The OAE retained David J. Flicker, M.D., who is Board-certified in both psychiatry and neurology, to examine respondent. At the ethics committee hearing Dr. Flicker testified that respondent had told him he knew at the time he misappropriated the funds that it was not his money and further knew that he could lose his license to practice law. Respondent had told Dr. Flicker that he began to use client trust funds in an effort to impress his wife "because she apparently had gone off with another man."

Dr. Flicker concluded that although respondent was somewhat depressed, he was able to understand the nature and quality of his acts, and knew the difference between right and wrong at the time he invaded his trust account. Dr. Flicker was unable to find a loss of competency or comprehension of a magnitude that would make respondent's invasion of the trust account other than knowing and purposeful. He concluded that respondent's mental capacity was never diminished to such a degree that he could not have conformed his behavior to the requirements of the law.

At the DEC hearing respondent testified to instances of knowing misappropriation of trust funds. He admitted to the unauthorized use of client trust funds to cover payments on the Clementses' mortgage. He further admitted that he had used trust funds, without client authorization, to pay his brother-in-law's tuition and to purchase a fur coat and ring for his wife. He did not recall what use he had made of the remaining misappropriated client funds.

In explanation, respondent stated:

I used funds from my trust account to attempt to aid my wife's family with their financial crisis and also to try to buy my wife's attention and loyalty. [Affidavit of respondent dated April 25, 1986, admitted into evidence as Exhibit P–12].

Respondent blamed much of his predicament on his marital difficulties. He and his wife, Gloria Clements Baker, first separated in 1979 after six years of marriage. Respondent, who had been raised by neighbors because of his now-deceased mother's alcoholism, was devasted by that separation, inasmuch as he regarded his wife as his only family. They reconciled more than a year later. During 1984, however, the marriage deteriorated. Mrs. Baker again left respondent in the fall of 1984. Respondent testified that he had been despondent over her departure and had begun to neglect certain aspects of his law practice and to lose clients because he had failed to complete his work in a timely manner.

At the DEC hearing, Carlo Joseph Baril, M.D., a psychiatrist, testified on behalf of respondent, who had sought counseling with him in March 1986 and had continued in therapy until November of that year. He did not return to Dr. Baril, however, until April of 1987, just prior to the first ethics committee hearing. Dr. Baril testified that at the time respondent began treatment, respondent was experiencing a "major depression with melancholia." The loss of his relationship with his wife triggered the major depression, which resulted in strong self-destructive impulses. Among respondent's self-destructive acts were the trust account invasions.

However, Dr. Baril, when asked if respondent knew the nature and quality of his act at the time of the invasion, testified as follows:

Q. At the time that Dale invaded his trust account and based upon the hypothetical question I have given you, and based upon your own examinations and discussions with Dale, did Dale, in your opinion, know the nature and quality of his act?

A. It is very difficult for me to answer that question.

Q. Why is that?

A. Because during my examination of Dale and getting to know him, to meeting with him on several occasions and from what I have heard, I did not *hear any evidence that Dale was experiencing a psychosis to the point that he was out of touch with reality. I did not hear that Dale was either having hallucinations or delusions and that he was not in control of his acts.*

However, I see that the self-destructive impulse may have been so strong that Dale probably in invading his trust account was obviously hurting himself.

Even he may have been aware of the fact that he was hurting himself, but the impulse may have been so strong that he could not stop it, but I do not see that as part of his psychotic process.

Q. In terms of not seeing this as a psychotic process but a process which you have nonetheless described for us, how would you describe or characterize that process?

A. I would characterize that process as a strong self-destructive impulse based on his depressive states. He has lost his wife, he has lost his love object. Life really did not mean too much to him as far as what was happening to him and therefore, an act of search was something that he probably did not stop to consider the full consequences of it.

It was meaningless to him probably at this point.

Q. As a result of this condition, do you have an opinion based upon reasonable medical certainty whether or not this condition caused him and/or substantially contribute to him invading the trust account?

A. *I would say contributing, not causing him, but I would say definitely contributing, contribution to that.* T. 6/5/87, p. 29, 1.11—p. 30, 1.23.

(Emphasis added).

Prior to his admission to the bar, respondent had been a member of the New Brunswick police department. Members of that department testified on respondent's behalf before the DEC.

The DEC conclusions are set forth by the DRB in its Decision and Recommendation:

> The committee concluded that, on at least twenty-seven occasions over a period of one year and five months, respondent wrote checks either payable to himself or to cover his in-laws' financial obligations, thereby knowingly misappropriating client funds. The committee noted respondent's selective recollection as to disposition of many of the checks in question and concluded that "on the issues most germane and critical to this matter ... the respondent's testimony is not believable." Discrepancies between respondent's testimony before the committee and the contents of his affidavit filed with the Court on April 25, 1986 which further reflect on respondent's credibility, were also noted by the committee. The committee further concluded that respondent had failed to demonstrate by even a preponderance of the credible evidence that he "suffered from a disease of the mind ... rendered him unable to tell right from wrong or to understand the nature and quality of his acts." The principles of *In re Wilson,* 181 [81] *N.J.* 451 [409 *A.*2d 1153] (1979) were therefore deemed by the committee to be controlling.

## II

The DRB concluded that there was clear and convincing evidence of unethical conduct. As the DRB stated in its Decision and Recommendation:

> Respondent has acknowledged that he knew that he was using client funds when he used his trust account to cover the Clements' mortgage payments, to pay his brother-in-law's tuition and to purchase expensive gifts for his wife. He told Dr. Flicker that he began to use trust account monies in an effort to impress his wife. In his defense, he contended that the "major depression" that resulted from his wife's desertion may have contributed to his self-destructive acts, including his invasion of client trust funds.

> Respondent's supposed defense does not go far enough. In the face of what appears to be, from all the facts, a series of knowing misappropriations, the Board must determine whether respondent "... suffered such a loss of competency, comprehension or will of such magnitude as would excuse conduct that was otherwise knowing or purposeful." *In re Jacob*, 95 *N.J.* 132, 137, 469 *A.*2d 498 (1984).

There is no dispute that respondent over a period of approximately a year and a half misappropriated his clients' funds. Respondent does not claim that he was unable to tell right from wrong or to understand the nature and quality of his act. Instead respondent, relying on the exculpatory standard set forth in *In re Jacob*, 95 *N.J.* 132, 469 *A.*2d 498 (1984), asserts that "his conduct and the proofs presented with respect thereto [including Dr. Gessner's report] demonstrate that such conduct was occasioned by a loss of will of sufficient magnitude so as to excuse Respondent from the mandate of *Wilson*."

In *In re Jacob, supra*, respondent, who had admittedly misappropriated his clients' funds, asserted that his medical condition accompanied by claimed psychogenic factors was entirely responsible for his unethical conduct. We disagreed, and stated:

> The report does not furnish any basis grounded in firmly established medical facts for a legal excuse of justification for respondent's misappropriations. There has been no demonstration by competent medical proofs that respondent suffered a loss of competency, comprehension or will of a magnitude that could excuse egregious misconduct that was clearly knowing, volitional and purposeful.

[95 *N.J.* at 137, 469 *A.*2d 498.]

In *In re Tusco*, 104 *N.J.* 59, 514 *A.*2d 1311 (1986), we rejected the psychological defense of "burn-out" as an excuse for the conduct of a respondent who was convicted of conspiracy to commit bribery, solicitation of a bribe, and two counts of offering a bribe. In rejecting that defense, we concluded:

\*      \*      \*      \*      \*      \*      \*      \*

> The Board concluded, and we agreed, that the medical explanations of respondent's conduct failed to demonstrate that he suffered a loss of competency, comprehension, or will of a magnitude that could excuse his egregious misconduct; the medical etiology of respondent's course of conduct does not suggest that his actions were not clearly knowing, volitional, and purposeful. *See In re Jacob*, 95 *N.J.* 132, 137 [469 *A.*2d 498] (1984). Moreover, his medical condition in no way dispels the damning fact that respondent's calculated course of conduct was designed to secure personal gain.
> [*Id.* at 65, 514 *A.*2d 1311.]

We also have considered the *Jacob* exculpatory standard in determining the appropriate discipline for respondents who offered evidence of alcohol or drug dependency as mitigating factors for their admitted misappropriation of funds. To date, we have found the medical evidence of such dependency to be insufficient to satisfy the high *Jacob* standard. *In re Canfield*, 104 *N.J.* 314, 516 *A.*2d 1114 (1986); *In re Romano*, 104 *N.J.* 306, 516 *A.*2d 1109 (1986); *In re Hein*, 104 *N.J.* 297, 516 *A.*2d 1105 (1986). Likewise, we have recently considered the *Jacob* standard with respect to compulsive gamblers who admittedly misappropriated funds. *In re Nitti*, 110 *N.J.* 321, 541 *A.*2d 217 (1988); *In re Lobbe*, 110 *N.J.* 59, 539 *A.*2d 729 (1988); *In re Goldberg*, 109 *N.J.* 163, 536 *A.*2d 224 (1988). In all those cases we reviewed the expert testimony and concluded in each case that the proofs offered did not demonstrate a loss of competency, comprehension, or will sufficient to excuse respondent's misappropriation.

Our review of the proofs in this case lead us to the same conclusion. Two psychiatric experts testified before the DEC, one for each side. Additionally, we have reviewed the report of Dr. Myron Gessner, Associate Professor of Clinical Psychiatry of the University of Medicine and Dentistry of New Jersey,

attached to respondent's brief. None of the psychiatrists found any indication that respondent could not distinguish between right and wrong or that he did not understand the nature and quality of his acts. All three psychiatrists concluded that respondent was suffering from a depression resulting from the break-up of his marriage.

Neither of respondent's experts found that his depression had led to the loss of competency, comprehension, or will sufficient to excuse his knowing misappropriation of client funds. Dr. Baril determined that respondent had a narcissistic personality disorder, which meant that he was very self-centered and selfish in a relationship. The loss of his wife had triggered a major depression that resulted in self-destructive impulses. One of the self-destructive acts was the invading of his trust account. However, Dr. Baril testified only that respondent's condition may have contributed to, but did not cause, his misappropriations. *Supra* at 501–502, 577 *A*.2d at 161–162.

Dr. Gessner, respondent's other expert, expressed the following opinion:

> Opinion: Based upon the history I received from Mr. Baker, my treatment of him since May 23, 1988, my review of the report of Dr. Carlo Baril, my training and experience, it is my professional opinion based upon medical certainty that Mr. Baker suffered from a major depressive disorder as well as a personality disorder with narcissistic and self-defeating features. His illnesses led him to think and act in desperate, depressed and self-destructive ways.
>
> It is my further opinion based upon reasonable medical certainty that Mr. Baker, because of his depressive, self-destructive sense undermined his treatment with Dr. Baril.

Most importantly, Dr. Gessner himself found that respondent knew what he was doing when he misused client funds.

> Knowing that the Clements family might lose their home (respondent) took funds from his clients' escrow account to pay the family's mortgage. While he knew that it was wrong to do so, he explained, "I did it to stay alive." He recalled using some of the money for gifts for Gloria. He was not keeping any records and cannot remember what he did with all the funds.

At another part of Dr. Gessner's report he states:

> When she [Gloria] began to leave him ... he went into a depressive tailspin. As with his mother he felt he had irreparably injured the one person upon whom his psychological survival depended. His knowledge that taking clients'

escrow funds was wrong was overwhelmed by his need to psychologically survive.

Considering the reports of Dr. Gessner and Dr. Baril, we conclude as in *In re Romano*, 104 *N.J.* 306, 310, 516 *A.*2d 1109 (1986): "Nothing in the record indicates, however, that respondent did not comprehend that he was misappropriating clients' funds or that he did not know or appreciate that the misappropriations were wrongful. Indeed, the evidence is clear and convincing that respondent knew that he was diverting client funds and that it was wrong." Here, as in *Romano*, respondent "has failed to demonstrate that a disease of the mind rendered him unable to tell right from wrong or to understand the nature and quality of his acts." *Id.* at 311, 516 *A.*2d 1109.

In short, respondent understood the nature and quality of his acts but did not care about the consequences. Like the respondents in *Hein*, *Romano*, and *Lobbe*, respondent recognized that he was dealing with clients' money "but it was simply a not-caring attitude that led to the use of the funds." *In re Lobbe, supra*, 110 *N.J.* at 65, 539 *A.*2d 729.

We agree with the conclusion of the DRB that respondent's "supposed defense does not go far enough." Respondent candidly admitted that he understood the situation. He fully knew and understood that when he invaded his trust accounts, the funds he was taking were not his. Moreover, he repeatedly lied to the Manginos and endangered their home to protect himself.

We are mindful that the purpose of discipline is not to punish the offender but to protect the integrity of the profession. Likewise, we are mindful of the extreme difficulties respondent has faced in life and successfully overcome. Nonetheless the proofs are insufficient to demonstrate a loss of such magnitude as to excuse his knowing acts of misappropriation.

For all the foregoing reasons, we conclude that the appropriate discipline is disbarment. We direct further that respondent

reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

*For disbarment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

## ORDER

It is ORDERED that DALE W. BAKER of NORTH BRUNSWICK, who was admitted to the bar of this State in 1980, be disbarred; and it is further

ORDERED that DALE W. BAKER reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that DALE W. BAKER be permanently restrained and enjoined from practicing law; and it is further

ORDERED that DALE W. BAKER comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with disbarred attorneys.